THOMAS KEARNEY, THOMAS JORDAN, AND CATHERINE HIS WIFE, ANASTASIA K. THOMAS, ANNE E. K. CHEESEBOROUGH, AND HORATIO N. KEARNEY, APPELLANTS, *v.* JOHN I. TAYLOR AND OTHERS.

Where land was sold in New Jersey by order of the Orphars Court of one of the counties, the conveyance was made not to the actual bidders, but to a person whom they appointed to represent them.

Afterwards, the Supreme Court of the State having decided that such a practice was irregular, the legislature passed a law enacting that, upon proof of the absence of fraud, such deeds might be given in evidence. This cured the defect in the title.

The purchasers were a company organized for the purpose of improving the land, and in their purchase there was neither actual or constructive fraud.

The law examined with respect to the bidding of associations at sales by public auction.

In this instance the price obtained was greater than any previous estimate of the value of the property.

There was no constructive fraud because, according to the evidence, the guardian of the minor children and the commissioners who decided that the property ought to be sold, did not become interested in the company until some time after the sale.

The circumstance that these persons became interested in the company before the first half of the purchase-money was due, is not a sufficient reason for setting aside the sale.

According to the preponderance of the evidence, the grave charge that the auctioneer who made the sale was one of the company, is not sustained.

THIS was an appeal from the Circuit Court of the United

States for the District of New Jersey, sitting as a court of equity.

The bill was filed by by Thomas and Horatio Kearney, and their sisters, Catherine, Anastasia, and Anne, who were the children of Edmund Kearney, deceased. The complainants were citizens of several States, viz.: Thomas and Catherine of Mississippi, Anne of Connecticut, Anastasia of Michigan, and Horatio of Ohio. The defendants were all citizens of New Jersey, and were as follows, viz.: John I. Taylor, Edward Taylor, Isaac K. Lippincott, Ezra Osborne, John Hopping, Daniel Holmes, and also the heirs of the following persons, viz.: of Leonard Walling, of John W. Holmes, of James Hopping, and of Joseph Taylor.

The bill was dismissed by the Circuit Court, and the complainants appealed.

The case was this:

On the 30th of December, 1822, Edward Kearney, then of the county of Monmouth, in the State of New Jersey, died intestate, seised in fee of a tract of land situated in that county, called Key Grove, containing 781 acres. The land bordered upon Rariton Bay, at the foot of Staten Island, for a mile or more, with water of sufficient depth for the near approach of vessels.

At the time of his death Kearney left the following children: James Kearney, born in December, 1801; Horatio N. Kearney, born in October, 1803; John Kearney, born in November, 1805; Mary Kearney, born in November, 1808; Thomas Kearney, born in September, 1810; Anastatia Kearney, born in October, 1813; Catherine Kearney, born in June, 1816; Anne E. Kearney, born in June, 1818.

In May, 1828, James Kearney sold all his interest in the land to Daniel Holmes and John W. Holmes.

A law of New Jersey, passed in 1820, (Revised Statutes of New Jersey of 1821, page 776 *et seq.*) directs that upon application made by the heirs of a person dying seised of lands, or by any person duly authorized in their behalf, or claiming under them, a division may be ordered; and the 19th section authorizes a sale when the land is so circumstanced that, in the opinion of the commissioners, partition cannot be made without great prejudice to the owners, and upon satisfactory proof of that fact being made to the court.

On the 15th day of April, 1829, Daniel Holmes, on behalf of himself and John W. Holmes, filed a petition for partition in the Orphans Court for the county of Monmouth, at the April term, 1829, against the heirs of Edmund Kearney, setting forth their purchase of the undivided one seventh part of the estate from James P. Kearney; that by reason of the minority of some of

the tenants in common, no division could take place by agreement, and praying the court to order a division.

At the time of these proceedings, Joseph Taylor was the administrator upon the estate of Edmund Kearney and the guardian of all his infant children who resided in the State of New Jersey.

The court granted the petition, and appointed James Hopping, Edward Taylor, and Leonard Walling, commissioners.

The commissioners took the necessary oath to perform their duty faithfully, on the 2d of June, 1829.

On the 10th of July, 1829, the commissioners reported to the court that they had caused a survey and map of the premises to be made, and that in their judgment the said premises were so circumstanced that a division thereof could not be made without great prejudice to the interest of the owners.

At July term, 1829, the court passed an order that the commissioners should make the sale, at public auction, to the highest bidder, giving at least sixty days' notice of the time and place of such sale, by advertisements put up in five of the most public places in the county, and also in one public newspaper circulating in the same county.

In January, 1830, the commissioners reported that they had sold the land, as follows:

Lot No. one, containing $224\frac{82}{100}$ acres, to Isaac K. Lippincott, at $30 per acre . . . $6,744.60

Lot No. two, containing $56\frac{42}{100}$ acres, to Thomas Carhart, for $28.25 per acre . . . 1,593.86½

Lot No. three, containing $32\frac{85}{100}$ acres, to Amos Walling, for $26.75 per acre . . . 878.73¾

Lot No. four, containing $18\frac{43}{100}$ acres, to Jonathan Tilton, at $38.50 per acre . . . 709.55½

Lot No. five, containing $59\frac{52}{100}$ acres, to Ezra Osborn, Esq., for $22.50 per acre . . . . 1,339.20

Lot No. six, containing $56\frac{84}{100}$ acres, to Ezra Osborn, Esq., for $13.25 per acre . . . . 753.13

Lot No. seven, containing $48\frac{46}{100}$ acres, to Isaac K. Lippincott, for $25.25 per acre . . . 1,223.61¾

Lot No. eight, containing $24\frac{11}{100}$ acres, to Richard S. Burrowes, for $43 per acre . . . 1,036.73

Lot No. nine, containing $7\frac{34}{100}$ acres, to Isaac K. Lippincott, for $18.50 per acre . . . 135.79

Lot No. ten, containing $16\frac{51}{100}$ acres, to Ezra Osborn, Esq., for $11.75 per acre . . . . 194.69¼

Lot No. eleven, containing $59\frac{13}{100}$ acres, to James Sproul, at $33.50 per acre . . . 1,980.85½

Kearney et al. *v.* Taylor et al.

| | |
|---|---|
| Lot No. twelve, containing $26\frac{02}{100}$ acres, to Thomas J. Walling, for $33 per acre . . . | 858.56 |
| Lot No. thirteen, containing $49\frac{42}{100}$ acres, to Amos Walling, for $29.50 per acre . . . | 1,457.89 |
| Lot No. fourteen, containing $40\frac{35}{100}$ acres, to Joseph Carhart, for $7 per acre . . . . | 282.45 |
| Lot No. fifteen, containing $61\frac{34}{100}$ acres, to Horatio Kearney, for $12.25 per acre . . . | 751.41 |
| | $19,941.19 |

Amounting, in all, to the sum of nineteen thousand nine hundred and forty-one dollars and nineteen cents, the one half of which, by the conditions of sale, was made payable on the first day of April next, when deeds were to be made, and possession given to the purchasers; the other half was made payable in one year from the first of April next, without interest, by the purchasers giving approved security for the payment thereof.

In witness whereof we have hereunto set our hands and seals, this twentieth day of January, in the year of our Lord one thousand eight hundred and thirty.

> JAMES HOPPING, [L. S.]
> EDWARD TAYLOR, [L. S.]
> LEONARD WALLING. [L. S.]

The court ratified the sale, and ordered the commissioners to execute deeds to the purchasers accordingly.

The lots numbered 5, 6, 7, 8, 9, and 10, were the subjects of the present suit.

On the 1st of April, 1830, the commissioners executed a deed for the above lots to John I. Taylor, reciting that they did so at the request of Osborn, Lippincott, and Burrowes.

About the time of the sale, in the preceding November, a company was organized, under circumstances which will presently be explained, for the purpose of purchasing the above lots and laying out a town upon them. The company consisted of the following persons, viz. Joseph Taylor, administrator and guardian; John I. Taylor, his son; Leonard Walling, commissioner; David S. Bray; Ezra Osborn, son-in-law of Joseph Taylor; James Hopping, commissioner; John Hopping, his brother; Primrose Hopping, another brother and auctioneer; Isaac R. Lippincott.

The time, manner, and object of the formation of the company are thus stated, in the answers of some of the defendants:

And the said John I. Taylor, for himself, further saith, that some time after the said sale, and before the deed to him from

42 *

said commissioners was executed, but the precise time when, this defendant cannot now remember, he bought of Ezra Osborn the share of Richard C. Burrowes, by verbal agreement, the said Osborn having, as this defendant understood, bought out the said Burrowes, and he, the said J. I. Taylor, paid said Burrowes $40 for it, as an advance thereon. And the said John I. Taylor further says, that he has no recollection of any thing else relating to the purchase of said Key Grove property, until, as he thinks, the meeting of the surveyors to lay out roads, in February, 1830, when it was proposed, by some one interested, that the deed for lots 5, 6, 7, 8, 9, and 10, should be made to the said J. I. Taylor, as he was then young and unmarried, for the convenience of transfers and to save expense. And this defendant, in further answering, says, that he does not know, of his own knowledge, how the said Ezra Osborn, David S. Bray, John Primrose, and James Hopping, Isaac K. Lippincott, Leonard Walling, came to [be] interested in the property, but believes, and has always so heard and been informed, that on the second day of the sale, viz. the fourth November, 1829, Daniel Holmes, who was anxious, and whose interest it was to make the property bring as much as possible, prevailed upon several gentlemen to join for the purpose of bidding for lot No. 8, aforesaid, and that John Hopping, Ezra Osborn, Richard C. Burrowes, Isaac K. Lippincott, Horatio N. Kearney, Septimus Stephens, and Primrose Hopping, joined for that purpose; and this defendant believes, and so charges the truth to be, that the only object of said Holmes in getting up said company was to increase the price of the property by creating competition; and that, but for the said company, the lot No. 8 would have been struck off to persons interested against improvement in that neighborhood, for about twenty-nine dollars per acre. And this defendant, the said John I. Taylor, in further answering, says, that said lot number 8 was a poor, barren, sandy soil, with wood of but very little value upon it, scarcely of value enough to pay for its own cutting, and worth but little for agricultural purposes; and that, in the opinion of this defendant, no other plan could have been hit upon which would have made the said lots 5, 6, 7, 8, 9, and 10, bring as much as they did bring. And the said John Hopping, in further answering for himself, says, that so far as he is himself concerned, he did not combine with any person whatever to bring about a sale of the Key Grove property, nor does he know or believe that anybody else did; that this defendant did not attend the said sale on either day of the sale, and previous to the said sale he did not know and had not heard that any company had been or would be formed for the purchase or sale of said Key Grove property; nor had he any idea or be-

lief that the said Key Grove property could be converted into a seaport town.    And the said John Hopping further says, that in the evening of the first day's sale, after the adjournment, or the morning of the next day, and before the sale commenced, in' a conversation between this' defendant and his brother, James Hopping, the said James Hopping told him that Daniel Holmes and Septimus Stevens talked of making up a company to buy the fishing point lot, viz. No. 8.    This defendant then asked said James Hopping if he was going to take a share, to which the said James replied that he could not, as he was a commissioner; said James then said he expected that this defendant could have a share if he wished.    This defendant then told him to tell Daniel Holmes that he would take a share; and this defendant, the said John Hopping, expects that his brother did so report him.    And the said John Hopping, for himself, says, that the said James Hopping had no interest in said purchase of lots No. 5, 6, 7, 8, 9, and 10, at the time of said sale, nor until about three months after, when he consented to come in and advance a part of the purchase-money, at the instance and request of this defendant and his brother Primrose.    And this defendant, in further answering for himself, says, that neither the said commissioners, nor the said guardian, nor any or either of them, to the best knowledge or belief of this defendant, were interested, directly or indirectly, in said purchase at the time thereof, nor had he ever heard, until after the reading of the bill in this cause, that there had been any combination, unlawful or otherwise, to bring about a sale of said Key Port property.    And these defendants, in further answering, say, that the said sale was in every respect fair, as far as these defendants know, and as they verily believe, and that they never heard of any allegation to the contrary, until about the time of the commencement of the suits in ejectment referred to in the bill of complaint; and this defendant, the said Ezra Osborn, answering for himself, absolutely denies that previous to said sale he combined with any person whatever to procure a sale of said property, nor did he ever know, hear, or believe, that such combination had been entered into by any person or persons whatever, nor did he know or believe at the time of said sale, nor does he now know or believe, that the said commissioners and guardian, or either or any of them, were at the time of said sale interested, directly or indirectly, in said purchase.    And this defendant, Ezra Osborn, in further answering, says, that his object in attending said sale was to bid for lot No. 1, and that he did bid for it until it got up, in the opinion of this defendant, to its full value, when this defendant stopped bidding, and Isaac Lippincott bidding higher, it was struck off to the said Lippincott just before dinner on the

second day of sale. And this defendant, in further answering, says, that according to his best memory and belief, said lot No. 1 was adjourned on the first day of sale at twenty-three dollars per acre on this defendant's bid, and that he became acquainted with said Lippincott for the first time at said sale.

Lippincott, in his answer, thus describes the formation of the company.

And that this defendant, inasmuch as he had then become the purchaser of lot No. 1, and it was evidently his interest that lot No. 8 should not fall into the hands of persons whose interest were adverse to the Key Grove property, consented to be one of several others to join and buy said lot No. 8; that said Daniel Holmes then proceeded to hunt for others to join in the said purchase, and left us for that purpose, as he said; after a short time the said Holmes returned, and reported that he had found several who would join with us in buying said lot No. 8, and mentioned the names of Osborn and Burrowes; and in a consultation between the said Stephens, Holmes, Burrowes, Osborn, and this defendant, it was then agreed that lot No. 8 should be purchased on said joint account, and that said Burrowes should be the bidder.

And this defendant charges the truth to be, that said Holmes did not speak to either of the said commissioners or guardians to join in said purchase, or if he did, that they declined it, and that there was no understanding, directly or indirectly, that said commissioners or guardians should be interested in said purchase; or if there was, or if said Holmes spoke or agreed with either or any of them, this defendant expressly avers that it was without the knowledge and consent of this defendant.

And this defendant further says, that he was induced to join in said purchase by the said representation of said Holmes and Stephens, and that he did not want, and had no intention of bidding for or buying said lot No. 8, nor did he want it on his individual account, and should not have joined in it but for the said solicitation of said Holmes and Stephens.

And this defendant in further answering says, that according to the best of his recollection and belief, that upon said sale being re-opened in the afternoon of said 4th November, 1829, said Burrowes bid for said lot No. 8 in pursuance of said agreement, and that it was struck off and sold by the said commissioners, openly and fairly, to the said Burrowes, for the said sum of $43 per acre, as the highest bidder.

And as this defendant then thought and believes, and as he still thinks and believes, the said Burrowes was the only person then known to the commissioners as the purchaser; and this defendant charges that he was the only person legally re-

sponsible for the purchase-money, and amply able to pay the same.

Holmes, in his answer, thus speaks of it. And this defendant in further answering says, that after he got upon the ground, upon the second day of sale, he went to work, by going first to one person and then another, to get up a company to bid for said lot No. 8, in opposition to the persons who it was understood were bidding from Middletown Point; and finally, after lot No. 1 was struck off to I. K. Lippincott, and with considerable difficulty, the following persons agreed verbally to join with this defendant in purchasing said lot No. 8: Isaac K. Lippincott, Richard C. Burrowes, Horatio N. Kearney, Ezra Osborn, Septimus Stephens, and he thinks Primrose Hopping. And this defendant says that, after the adjournment of the first day of sale he spoke also to James Hopping, one of said commissioners, to be interested, this defendant not then knowing that there was any thing illegal in his becoming so, but the said James Hopping absolutely refused on account of his being a commissioner; this defendant then requested him to speak to his brother John Hopping, when he went home, and see if he would not come in. And this defendant says that some one, either James or Primrose Hopping, reported next day that John Hopping would come in, and he was accordingly considered as one of the company at the sale.

And this defendant in further answering says, that said company was got up by this defendant on the spur of the occasion, and for no other purpose whatever but to create competition and make property bring more, and extended originally only to lot No. 8. And this defendant in further answering says, that neither James Hopping, Leonard Walling, [n] or Joseph Taylor, were [was] at the time of the sale a part of said company, or interested in any way in the purchase of any part of said lots 5, 6, 7, 8, 9, and 10.

The evidence of Primrose Hopping was as follows:

Primrose Hopping being sworn, says: I was the crier of this vendue. I struck off No. 8 to Richard C. Burrowes. He was the highest bidder. William Walling and Richard C. Burrowes were the only two bidders some considerable time before it was struck off; one stood on my right hand and the other on the left. William Walling was on the left hand and Richard C. Burrowes on the right. They were bidding twenty-five or fifty cents per acre. William Walling was last bidder, except Richard C. Burrowes. Burrowes bid openly, and Walling by a wink. I had a timepiece, and gave warning that if I had not another bid I would strike it off to the highest bidder; and after I got a bid from Burrowes, I immediately turned to Wall-

ing to get a bid, and did this repeatedly; and dwelt an unusual time to get a bid, but could get none. I dwelt because he looked at me as if anxious, but never bid; and finally I struck it off to Richard C. Burrowes. I gave fair warning that I was going to strike it off. I think it was put up at the first day, but don't recollect the amount it bid up to. I had no instructions from commissioners to strike it off to Burrowes. I had instructions from Edward Taylor several times not to dwell so long upon the property. The whole farm was struck off to the highest bidder, to my certain knowledge. Neither of commissioners or Joseph Taylor were interested in this property at the time it was sold. I got the highest possible price for each section of the property. It was much better to have the property sold than partitioned. I did not consider myself interested in this property at the time it was struck off. I think Richard C. Burrowes spoke to me about it. I don't recollect what I said. I don't recollect what the precise words were. I don't think I gave him a decided answer.

I think Burrowes spoke to me on the second day of sale. I don't recollect that he told me who were concerned in the company. I can't say if any of the company lots had been sold when Burrowes spoke to me. I am not sure if Burrowes said it to me, or if it was the common talk to try to make a landing there. When Burrowes asked me, I think I did not tell Burrowes I would not join. I extended the time several times in the sale of No. 8. I gave further time after Burrowes' last bid. I think Walling was a little farthest off. I did not know Van Pelt as a bidder. Van Pelt claimed the bid. I requested the property to be set up again. That was my custom. It was referred to commissioners, and they decided that it was stricken off fair and should not be set up again. I did have an interest in company property afterwards. I never paid any of the purchase-money. James, and John, and self had two-thirds. They were my two brothers. My share was sold to Capt. Vanderbilt with the rest in 1839. I depended on my brothers. They made payments. Brothers received purchase-money, and accounted to me at our settlement after. There was a balance paid me. We had other dealings. I can't remember when I came in partner with them. I can't say whose share of these lots James and John got. I don't know which of my brothers I got the share of, John or James. I don't know when, or if before deed to John I. Taylor. I have no knowledge when I came in a partner. John I. Taylor gave me some land in exchange for lot No. 17, and some money. He and Joseph Taylor gave me 7½ acres back, next to Vandine's. The trade was made several years ago, before the commencement of suit, &c., &c., &c.

In April, 1830, twenty-four building lots were laid out upon part of lot No. 8, sixteen of which were distributed in severalty amongst the members of the company, and the residue left to be sold by John I. Taylor for their benefit. Other measures of improvement were adopted which it is not necessary to state particularly.

In the case of Doe. v. Lambert, 1 Green's Law Reports, 182, the Supreme Court of New Jersey decided, that a deed made by the commissioners in partition proceedings to any other person than the one reported as purchaser, was void.

In consequence of this decision, the heirs of Edmund Kearney instituted actions of ejectment in the Circuit Court of the United States for the District of New Jersey, in order to recover the property; whereupon, the company applied to the legislature for relief.

In March, 1841, the legislature passed an act which recited that deeds were sometimes made to other persons than the reported purchasers, and then declared as follows:—

" Sec. 1. Be it enacted by the Council and General Assembly of this State, and it is hereby enacted by the authority of the same, that, upon proof being made to the satisfaction of the court or jury before whom any such deed or conveyance may be offered in evidence, that the lands or real estate therein mentioned were sold fairly and without fraud, and that such deed or conveyance was made and executed in good faith, and for a sufficient consideration, and with the consent of the person or persons reported to the court as the purchaser or purchasers, the said deed or conveyance shall have the same force and effect as though the same had been made and executed to the purchaser or purchasers reported to the court."

In October, 1841, the bill in this cause was filed by the heirs of Edmund Kearney, charging a fraudulent combination between Daniel Holmes, Joseph Taylor, Leonard Walling, James Hopping, John I. Taylor, and others named in the bill, for the purpose of bring about a compulsory sale of the Key Grove estate, with a view to establishing a seaport town on a part thereof; that, to that end, Holmes made the purchase of James P. Kearney, instituted the proceedings in partition, and, through the fraudulent coöperation of Joseph Taylor, the guardian, and Leonard Walling and James Hopping, two of the commissioners, and Primrose Hopping, the crier, and others confederating with them, wrongfully and fraudulently brought about, under pretext and color of law, a sale of the entire estate, under the proceedings in partition. The bill makes a case of fraud in fact, as well as of fraud in law, growing out of the fiduciary relations which the guardian and commissioners and auctioneer

respectively sustained to the estate and to the heirs to whom it belongs. The prayer is for an account of the proceeds of all wood and timber cut from the six lots conveyed by the commissioners to John I. Taylor; for an injunction to restrain waste; that the conveyance to John I. Taylor, and the sale of these lots by the commissioners, be declared void; and for other relief.

Extracts from the answers of the principal defendants have already been given.

In April, 1842, the trial at law of the ejectment came on before Judges Baldwin and Dickenson; and the court held that, under the provisions of the act of 1841, the defendant must prove that there was no fraud of any kind in the sale, in order to avail himself of the provisions of the act; but the jury not agreeing, no verdict was rendered in the case.

Whilst the present suit was pending, viz. on the 14th of February, 1844, the legislature passed a private act, entitled "An act to confirm the sales of the real estate whereof Edmund Kearney, deceased, late of the county of Monmouth, died 'seised.'"

This act recited the circumstances of the sale, and that doubts had arisen respecting the title to the lots, and then declared:

"Section 1. Be it enacted by the council and general assembly of this State, and it is hereby enacted by the authority of the same, that the several deeds, so given by the said commissioners for the said several lots, shall be deemed and taken, and the same are hereby declared to be valid and effectual in law, to convey the estate therein and thereby intended to be conveyed; and that the said deeds, or any of them, and all subsequent conveyances of the said estate, or any part thereof, shall not be impeached in any court whatever for any such alleged interest in the said commissioners, or any of them, in the property so sold by them, as aforesaid, or for any alleged defect or informality in the execution of the powers of the said commissioners, or in the proceedings of the said orphans' court; and that the said deeds, or any of them, shall not be invalidated or impeached upon any other ground than that of absolute, direct, and actual fraud on the part of the said commissioners."

The defendants then filed a supplemental answer, averring that there was no fraud, and praying to be allowed the benefit of this act; and also filed a cross bill, the proceedings under which it is not material to notice in this report.

In September, 1851, the Circuit Court decreed that the bill should be dismissed with costs, from which decree the complainants appealed to this court.

It was argued by *Mr. Converse* and *Mr. Ewing*, for the appellants, and by *Mr. Dayton* and *Mr. Johnson*, for the appellees.

The arguments of the counsel on both sides were directed, in a great measure to an examination of the facts in the case, as disclosed in the answers and evidence.

The points of law for the appellants were the following:

I. That the courts of the United States, having full jurisdiction of the case conferred on them by the Constitution, and the case being actually pending in the Circuit Court, the legislature of New Jersey had no power, by private act or special edict, enacted or pronounced while the case was so pending, to interfere with or to control the decision of the United States court therein. That it could not itself directly pronounce or dictate to the court what judgment it should pronounce in the case; nor could it, by changing the principles of law, or the rules of evidence governing it, by such special edict, indirectly make or control the judgment or decree of the court; and that, such being the purport and end of the act of February 14, 1844, the same is void.

II. That there was actual fraud by the commissioners in the execution of their trust, and that, if we admit the special act of February 14, 1844, to be valid, the sale and conveyance, made by the commissioners to themselves and their partners, are void under its provisions.

III. That material recitals, in the preamble to that act, appear to be false; and, it being a private act, and the legislature deceived, and induced by false pretences to pass it, it is void.

I. We contend, then, that the act of February 14, 1844, is void; and,

1st. Because it violates the 22d article of the constitution of New Jersey, which declares that the common law of England shall remain in force in that State, until altered "by a future law of the legislature."

This act is not a law, but a mere legislative edict interposed between two parties litigant, directing what manner of decree shall be made between them — a taking the property from one and giving it to the other. To be a law, it must be general — a rule affecting property, generally, in like circumstances. This act is in violation of the principles of the common law, and, not being itself a law, is therefore void. 1 Black. Com. 44, 138; Taylor *v.* Porter, 4 Hill, N. Y. Rep. 140; Regents of University of Maryland *v.* Williams, 9 Gill & Johns. 412; Ervine's Appeal, 16 Penn. State Rep. 257; McNutt *v.* Bland, 2 How. 16–17; Webster *v.* Cooper, 14 Id. 503; Proprietors of Kennebeck

v. Laboree et al. 2 Greenl. Rep. 288–295; Attorney-General v. Stevens, 1 Saxton's N. Jer. R. 369, 380. See further authorities, *post*, p. 23.

2d. It also violates that clause of the same article of the constitution of New Jersey which declares, "that the inestimable right of trial by jury shall remain confirmed, as a part of the law of this colony, without repeal, for ever." Scudder v. Trenton Delaware Falls, 1 Saxton, N. Jer. 696, 726, 727; Arrowsmith v. Burlingim, 4 McLean, 489; Embury v. Conner, 3 Comstock, 511, 516, 517; Benson v. Mayor, &c. 10 Barbour, S. C. 223, 224; People v. White, 11 Id. S. C. 26, 30; Parkman v. Justices, 9 Georgia, 341, 349, 350, 351; McLeod v. Burroughs, 9 Id. 213, 215, 216; Vanzant v. Waddle, 2 Yerg. 260, 269, 270, 271; Walley v. Kennedy, 2 Id. 554, 555, 556; Jones v. Perry, 10 Id. 59, 71, 72; Holden v. James, 11 Mass. 396; Hake v. Henderson, 4 Dev. N. Car. 15; 2 Kent, 1–13 and note (b) p. 13, and note p. 4.

3d. This act, not being a law, is not to be regarded as a rule of decision in the courts of the United States, under the provisions of the 34th section of the judiciary act, even "in a trial at common law."

4th. It violates the 2d section of the 4th article of the Constitution of the United States, which declares, "that the citizens of each State shall be entitled to all the privileges and immunities of the citizens in the several States."

This act is a special edict against citizens of States, other than New Jersey, divesting them of their inheritance, or laying down special rules applicable to their estate only, which may have that effect. If the act were general against all parties, citizens of other States, who might hold property so circumstanced, it would be clearly unconstitutional. We think the objection loses none of its force because the act is special, and applied to a single case. It declares that the property of these parties, who are citizens of other States, shall not be entitled to the protection which the laws of the State extend to the property of its own citizens. 4 Johns. Ch. Rep. 430.

5th. It is against the spirit, if not the letter, of the 2d section of the 3d article of the Constitution of the United States, which gives to the courts of the United States jurisdiction in all cases "between citizens of different States."

The national tribunal would be, in effect, ousted of its jurisdiction, and the citizens of other States deprived of its protection, if the State legislature could interpose, pending the case, and, by special edict, pronounce a decree, or lay down new principles of law and new rules of evidence for that case alone, which would dictate to and control the court in the decree it

should pronounce. This would defeat the end and purpose of this provision of the Constitution. For every one is aware that the citizens of other States are much safer from injustice and wrong where their rights are adjudicated by the judiciary, than the legislature of a State. United States *v.* Peters, 5 Cranch, 15; Ogden *v.* Blacklege, 2 Cranch, 194; Suydam *v.* Broadnax, 14 Pet. 67, 74, 75; Rhode Island *v.* Massachusetts, 12 Id. 751.

6th. The right to pass an act such as this is inconsistent with a republican, constitutional government, or any government with limited powers, for it deprives the citizen of one of his absolute rights — the possession and enjoyment of property. It is admissible only in a purely Asiatic despotism. People *v.* Supervisors of Westchester, 4 Barb. S. C. Rep. 64; Norman *v.* Heist, 5 Watts & Serg. 171; Bumberger *v.* Clippenger, 5 Id. 311; Ervine's Appeal, 16 Penn. State Rep. 257.

II. We contend that there was actual fraud by the commissioners in the execution of their trust; and if we admit the special act of February 14, 1844, to be valid, the sale and conveyance made by the commissioners to themselves and their partners are void.

A trustee who becomes a purchaser of the trust estate is, in the estimation of law, a fraudulent purchaser; and, because of the temptation and opportunity to commit fraud, and the ease with which he can cover it from detection such purchase is of itself a fraud, and a title procured under it is void, at the option of the *cestui que trust.*

The special act of February 14, 1844, declares that this sale and the deeds made under it, "shall be valid in law," unless " impeached for absolute, direct, and actual fraud." It does not, however, require this court to change the rules of evidence applicable in all like cases, where the question is, whether there was or was not actual fraud on the part of the trustee in dealing with the property and funds of his *cestui que trust.* The special act merely relieves the trustee from the judgment of law consequent upon their purchase. It leaves all incidental questions open, to be dealt with according to general principles

And the trustees stand in an inauspicious relation to the property; they are vendors of the estate of others, and they are purchasers for themselves; a court of equity will, therefor , examine their acts with jealous caution, and in dubious matters it can allow them the benefit of no favorable presumption. Michaud *v.* Girod, 4 How. 503.

And if the trustees have resorted to artifice or falsehood to conceal their interest; or if, contrary to their duty, they have retained the trust fund, and used it for their own benefit or that of their friends; or if they combined with others to prevent in-

vestigation, or to postpone accountability, they will be held chargeable with actual fraud.

1st. Two of the commissioners, Leonard Walling and James Hopping, were undoubted partners at the time the sale was reported to the court; if not so, by a secret understanding among themselves on the day of sale. But to cover and conceal their interest and that of the guardian, Joseph Taylor, they reported to the court that Ezra Osborn was the purchaser of lots 5, 6, and 10; Isaac K. Lippincott of lots 7 and 9, and Richard S. Burrowes of lot No. 8; which report was false.

And in the deed which they executed to John I. Taylor, April 1st, 1830, they recite that Osborn, Lippincott, and Burrowes, bid off lots 5, 6, 7, 8, 9, and 10, for John I. Taylor, as his agent, which recital was false, and, together with the conveyance to him, intended to conceal their interest in the purchase.

This falsehood and concealment was for their own advantage. Had they reported the sale and the parties in interest truly to the court, it could not have been confirmed.

2d. They retained the trust fund for a long time in their hands, and used it for the benefit of themselves and their families.

No costs appear to have been taxed in the case; and the amount is left to conjecture. We suppose that $341.19 will be more than sufficient to cover them. This deducted will reduce the net proceeds of sale to $19,600.

(The counsel then went into a long examination of the State of the accounts, which is omitted.)

3d. In order the better to secure to themselves the use of the trust fund, and to enable them to purchase and improve a portion of the estate with its proceeds, the commissioners associated themselves, and combined with Joseph Taylor, the guardian of four of the minor children and heirs, and through his connivance and participation avoided investigation and postponed accountability.

The record shows that, from April 1st, 1830, to April 1st, 1831, there was in the hands of the commissioners and guardian, of the funds of the estate . . . . . . . . . . $6,025.29
From April 1st, 1831, to April 1st, 1832 . . . . 10,017.56

There is no evidence in the record that any part of this fund passed out of the hands of the members of the partnership prior to the 7th of April, 1837. The record shows that there did certainly remain in their hands, until the last named date, at least $7,994.59.

The estate was thus made to pay for itself and improve itself; and it is not surprising that one of the partners (Primrose Hopping) testifies that he never paid any thing on his purchase, and that John Hopping does not know when, where, or to whom he paid.

Kearney et al. v. Taylor et al.

It is not at all probable that either of the commissioners, or their brothers, or the guardian, his son, or son-in-law, ever paid a dollar towards their purchase.

The proceeds of the estate could not have been thus held to pay for the estate without combination between the commissioners and guardian.

4th. We will endeavor to show, that the report of the commissioners that the premises could not be divided without great prejudice to the interest of the owners was untrue, and induced by a purpose to possess themselves of a portion of the property. There were seven shares. The commissioners divided the property into fifteen parts before making their report that it could not be divided.

5th. There was a controversy at the bidding, which was first decided by Primrose Hopping, a secret partner; and afterwards, on appeal, by the commissioners, (two of them, as we think we have shown,) also secret partners. It was decided in their own favor.

III. The recitals of the act of February 14th, 1844, show that the legislature was decided, and passed the act under a mistake as to the facts. McIntire Poor School v. Zanesville Canal and Manuf. Co. 9 Hammond's Ohio Rep. 289–290; 2 Black. Com: 345–6.

1st. The act contemplates that the deed which it confirms had been made to a party to whom the interest in the property had been transferred, for a valuable consideration — not to a person who received the conveyance to conceal the interest of others.

2d. The combination between the commissioners and the guardian to unite in the purchase of the estate — a combination fraudulent in itself — was not made known to the legislature.

3d. The sale and conveyance by the commissioners were not made in good faith. There were *suppressio veri* and *suggestio falsi* in all their several papers relating to both.

4th. The purchase-money was not honestly and fully paid to the persons entitled.

The counsel for the appellees bestowed a great deal of attention upon the act passed by the legislature of 1844. Having given the views of the opposite counsel upon this point, it is proper to state also the views taken by the counsel for the appellees.

The act of March, 1841, required proof, to the satisfaction of the court or jury, that the lands were sold fairly and without fraud — that the deed was executed in good faith, for a sufficient consideration, and with the consent of reported purchasers.

The obvious meaning of this act, as we contended, was actual

43*

fraud, actual good 'faith. It was so understood by the legisla-
ture, and so understood by the remonstrants, who opposed it
to the last.

Yet Judge Baldwin ruled, in effect, that our condition was
made worse rather than better by this act. He said, first, that
the act was a legislative recognition of Doe *v.* Lambert; second,
that we must convince both court and jury that there was no
fraud; third, that the act did not designate the character of
fraud, which was to affect such deeds; that in consequence, all
fraud, actual or legal, would vitiate the deed; that if the com-
missioners were interested in the sale, (before their duties were
discharged,) however innocent or ignorant, or however large the
price and fair the sale, it was a fraud in law, and vitiated the
deed.

This opinion of Judge Baldwin, involved a necessity for fur-
ther legislation. Notice of application for a private law, was
published six weeks in the Monmouth Democrat, (in the county
where the lands lie,) under a rule of the house. The bill, after
such notice, was introduced and passed into a law, 14th Febru-
ary, 1844.

*First.* Does that act conflict with the Constitution of New
Jersey or the United States?

*Second.* Was there " absolute, direct, and actual fraud on the
part of said commissioners ? "

Another point is made by the answer to the cross bill, to wit:

*Third.* Was the act of 1844 a fraud on the legislature, and
can it be avoided for that cause?

1. Does the act of 1844 violate the Constitution of New
Jersey?

The act is purely remedial. It relieves against a technical ex-
ception, to wit, the making of a deed to a person other than the
bidder; and it relieves from a legal or constructive fraud, (if
there be any,) though not from actual fraud. It is important to
remember that even if the commissioners did become interested
(which is expressly denied) the deed was not void, but voidable
only by the heirs, and them only. Den *v.* McKnight, 6 Hal. R.
386. And equity even then would put them on terms.

Our constitution, July 2d, 1776, gives plenary powers of
legislation. Nothing is reserved from their power except the
rights of conscience and trial by jury.

New Jersey had no bill of rights. Her constitution did not
even separate the legislative and judicial departments of govern-
ment. There was no provision against interference with vested
rights or against retrospective laws. 1 Kent's Com. 448; 3 Story
on Cont. 266; Bennett *v.* Boggs, 1 Bald. C. R. 74; Bonaparte *v.*
C. & A. R. R. Co. Id. 220. Under her constitution of 1776 her

courts and jurists have even held her power of legislation absolute, as of British Parliament. So much of the common and statute law of England was adopted as theretofore in use in the province, and until changed. Sec. 22 of constitution of 1776.

The act of 1844 did not violate the common law. Private acts are a common-law assurance or conveyance. So treated in British legislation. 5 Cruise Dig. p. 1 to 15; title "Private Acts." It shows that Parliament legislated by private acts as extensively as we do.

But if the common law were otherwise, the constitution of New Jersey adopted so much thereof only as had been in use in the province. This principle had not been in use.

Where a power to legislate and cure defects has been long exercised, as in the past history of New Jersey, it is the strongest evidence of its existence. Briscoe *v.* Bank of Kentucky, 11 Pet. 257; State *v.* Mayhew, 2 Gill, 487.

Commencing after the surrender by the proprietors of New Jersey of the powers of government in 1702, we have a series of these remedial acts of the most extended character.

The following public acts are still on the statute book.

(Then followed a reference to fifty-nine private acts.)

This long list of private acts shows the constant exercise of legislative power over wills, deeds, partitions, trusts, and other cases. They do not cure the evidence merely, but in many cases make the law to meet the case; affecting legal interests vested in minors, married women, and others, in various forms and without assent. I may add here that all the adjoining States and Congress itself has passed many such remedial acts, confirming land titles, &c. 14 Pet. 353, 382.

3. The restriction in the constitution in behalf of trial by jury is not violated. The object of this act was to cure a mere legal fraud, (if any) not that actual fraud, or fraud in fact, of which the jury is the judge. It determines a principle, not a fact, and it leaves trial by jury as it was.

Further, "trial by jury," spoken of in that constitution, refers only to such trial by jury as had been theretofore practised in the colony. It is evident, from previous as well as subsequent legislation herein before referred to, that trial by jury must have been ever held in this colony, subject to such power of legislation. There are many cases of civil right where trial by jury is directly taken away; as in appraisement of lands taken for public purposes; it was so before the adoption of the constitution of 1776. It was so under the proprietary government. Leam & Spi. 440. Also under the royal government. Allison's Laws of New Jersey, 273, sec. 3. Also since the constitution of 1776. Saxton Ch. R. 694. Scudder *v.* Trenton Delaware Falls Co. and cases cited there.

4. This law does not encroach on the judicial department, (if it shall be thought that by the theory of our government, without constitutional provision, these departments are distinct;) The act does not declare what the law was theretofore, but what it shall be in future, and it applies such law to existing cases, or in other words, affects existing rights. · It comes back to the same question, viz. the power of the legislature as respects rights vested in law, though subject to certain equities. It is not a judicial act to rectify a bad sale. Wilkinson v. Leland, 2 Peters, 660.

All that class of laws which are held void as encroachments on the judicial departments of government, are aside the question. But aside from this, where there is no constitutional restriction, as in New Jersey, the legislature may, in some qualified degree, exercise judicial power, &c. 2 Root, 350 ; 3 Dal. 386 ; 3 Greenl. 334, and the acts hereinbefore cited, shows that New Jersey has always done so. There is nothing in the Constitution of the United States against it. 3 Story on Cont. 266, 267.

5. The next and a principal point is, as to the question whether the act conflicts with the Constitution of the United States. Does it destroy the obligation of a contract?

All else ends in arguments looking to the propriety of such special legislation.

The object of this law is not to disturb or impair contracts, but enforce them. The commissioners who sold, were the agents of the court. They sold and received the purchase-money in full, and made a deed. This law is to enforce that contract. It confirms existing rights only in favor of the purchaser, who paid his money.

The heirs became seised, it is said, by reason of the defective character of the proceedings ; but such seisin was subject to an equity, which this act recognizes and enforces. 1 Kent, Com. 455; Goshen v. Stonnington, 4 Conn. R. 209 ; Langdon v. Strong, 2 Vermont R. 234; 3 Story on Cont. 267 ; Underwood v. Lilly, 10 Serg. & Rawle, 97; Beade v. Walker, 6 Conn. R. 190; Booth v. Booth, 7 Ib. 350; 3 McLean, 212; 7 Blackf. 474; 8 Mass. 472 – 9; Ib. 360; 2 Harr. & Johnson, 230; 6 Gill & Johnson, 461 ; 3 Scammon, 443.

A court of equity often exercises this power in favor of him who pays the purchase-money. This law does no more. It only says, a deed made by request of the purchasers to John L. Taylor, as their agent, shall be good.

Legislation often does what a court of equity may do ; and to control property of infants, and order sale of their estates and deeds therefor, is or was of constant occurrence. See acts hereinbefore cited, and 15 Wend. 436 ; 20 Wend. 365.

There were many such acts before the adoption of the Constitution of the United States; and that instrument did not mean to destroy remedial State legislation. We must look to the history of the times for its meaning, if doubtful. Rhode Island v. Massachusetts, 12 Peters, 557.

The Supreme Court of the United States has repeatedly held such acts valid, and that too even after judgment. Satterlee v. Matthewson, 2 Peters, 380 ; Wilkinson v. Leland, 2 Ib. 657, 661 ; Calder and wife v. Bull and wife, 3 Dallas, 386 ; Watson et al. v. Mercer, 8 Peters, 98, 108 ; Charles R. Bridge v. Warren Bridge, 11 Ib. 420 ; Watkins v. Holman, 16 Ib. 62 ; 3 Story's Com. on C. 266, collects cases up to 2 Peters ; Bennett v. Bogs, Baldwin's R. 74 ; Fletcher v. Peck, 6 Cranch, 67, 134.

Dicta in this case reviewed in later cases above cited.

*Second Point.* Was there " absolute, direct, and actual fraud on the part of said commissioners ? "

Outside of the pleadings, this had been heretofore scarcely pretended. The evidence is all the other way.

The charges of fraud in the original bill are of the grossest character. The answers, which are directly responsive, are evidence.

Edward Taylor is the only surviving commissioner. He has answered fully, and been likewise sworn as a witness. He denies all fraud on the part of the commissioners, and says the property brought more than it was worth, in his judgment, and more than it would bring in the same condition at that time (April, 1844.)

The company who bought the lots in question, were Daniel Holmes, Ezra Osborn, Isaac K. Lippincott, Richard C. Burrowes, Horatio N. Kearney, Septimus Stephens.

They all answer, expressly denying all fraud, except Stephens, who declined his share, and died before any question. Horatio N. Kearney was the brother and one of the heirs, and has answered, disclaiming any knowledge of fraud at the time.

The answers and evidence show, in brief, this state of facts.

Edward Kearney died in 1822. His whole personal estate was but $1,080.33. His real estate was 781 acres of light sandy land, 431 of which only were cleared — which had been in possession of himself and ancestors for many years.

In 1829, there were living six children, I think, interested in the estate, of whom three or four were minors, and three of these minors were girls, with no means of support.

One of the children had sold his entire share (one seventh) to Daniel Holmes, for $1,600.

The highest price any witness has put on the whole real estate was $15,000. It rented for many years prior to the sale for $260 to $300 only.

Holmes applied for a partition, and commissioners having reported it could not be divided without prejudice, they were ordered to sell.

The laws of New Jersey required only that the commissioners should advertise in one newspaper in the county where the lands lie. They did, in addition, advertise in two newspapers in the City of New York, and had 100 large puffing handbills set up, showing the advantages of the property. There was a large attendance on the sale, and the property brought $19,941.19.

The money was paid, and the heirs have had the benefit of it.

Every witness who had been examined says the sale was fair, and the price much exceeded public expectation, and was more than Horatio Kearney, one of the heirs, said it was worth.

The judgment of the company, who bought lots 5 to 10, inclusive, may be gathered from the disposition they made of their shares at different times afterwards. Holmes, the prime mover, sold his interest to Joseph Taylor for a net profit of $25. Burrowes sold his to Osborn for $40. Horatio Kearney sold his to Bray for $40. Stephens backed out, and Lippincott says the company have saved themselves from actual loss on the purchase only by the earnings of certain vessels they have since run in connection.

Yet after the gross charges of fraud and speculation in their bill, made without knowledge, were fully met both by answers and by evidence, these same charges are recklessly repeated, again and again, in the answer to the cross bill, but without the slightest evidence to sustain them.

I cannot, in the mere statement of points, comment on the evidence in detail, but commend this part of the case to the careful examination of the court. It will show clearly there was no actual fraud on the part of the commissioners.

*Third Point.* Was the act of 1844, a fraud on the legislature?

1. The first answer is, if it were so, the party can't get clear of it in this way. No case can be found, to show by evidence *aliunde* a law void because the legislature did not know what it was about.

2. The legislature understood the whole question. Six weeks' notice of the application was given.

The evidence of Mr. Sullivan shows his remonstrance was read and filed, with all its charges of fraud, before the act in the House of Assembly was referred to the judiciary committee. Yet afterwards the act passed unanimously. And a reference to the legislative journal of council of same year, shows it passed the other branch of the legislature, also upon the ayes and noes, unanimously.

Besides this, Mr. Sullivan immediately filed his petition for repeal, and it was at once referred to the judicary committee. The council journal shows, after full consideration, it was unanimously denied.

No private law has ever passed our legislature after a more full and thorough discussion. The minutes of these bodies are referred to as evidence by Mr. Sullivan, the witness, counsel, and attorney at law, and in fact, on part of the complainants.

Mr. Justice NELSON delivered the opinion of the Court.

This is an appeal from a decree of the Circuit Court of the United States for the District of New Jersey.

The bill was filed in the court below by the heirs of Edmund Kearney, deceased, against the defendants, to set aside a sale of a part of a farm descended to them, situate on Raritan Bay, in New Jersey, under an order of the Orphans' Court in that State, in a case of partition, a sale having been ordered upon the ground that partition could not be made without prejudice to the interest of the heirs. The farm, consisting of some seven hundred and eighty-one acres, was divided by the commissioners into fifteen allotments, preparatory to the sale, and which sold for the aggregate price of $19,941.19. The bill seeks to set aside six of these allotments, Nos. 5, 6, 7, 8, 9, and 10, embracing about two hundred and eleven acres, and which sold for the aggregate sum of $4,683.15. At the time of the application to the Orphans' Court for the partition, April term, 1829, there were seven surviving heirs of the estate, four of whom were minors. Daniel and John W. Holmes, who had purchased some year previously the interest of James P. Kearney, one of the heirs, made the application for the partition. The act of New Jersey, conferring the powers upon the Orphans' Court, provides that the application may be made by the heirs, for any person claiming under them, and further, that if, in the opinion of the commissioners, partition cannot be made without great prejudice to the owners, and on satisfactory proof to the court of the same, a sale of the premises shall be ordered.

It is not material to refer particularly to the proceedings before the Orphans' Court, as we do not understand that any serious question has been made upon them. It has, indeed, been objected that no personal notice of the application, or of any of the proceedings before the court, was given to the heirs, whether adults or minors; and also, that no guardian *ad litem* was appointed for the latter. But, it is conceded, neither of these steps, however judicious, and proper for the purpose of protecting the interest of the parties concerned, are required by the statute of New Jersey or practice of the court.

The main ground relied upon for setting aside the sale, is to be found in the allegations and proofs of fraud in the proceedings that took place at the commissioners' sale of the premises, under the order of the court. It is claimed that this sale is void, and should be set aside, on the ground of either actual or constructive fraud, or both. This sale took place in November, 1829, and was confirmed by the court on the report of the commissioners the January term following.

Deeds of conveyance were made of the premises sold in the month of April thereafter, when one half of the purchase-money was paid; the remaining half has been since paid in pursuance of the conditions of sale, and order of the Orphans' Court; and the whole of the purchase-money received by the heirs. All of them, except three, became of age as early as at, or before, September, 1831. Another became of age in 1834. This bill was filed October, 1841, some twelve years since the sale took place, and eleven since most of the purchase-money was paid. Actions of ejectment had been brought in the early part of that year, the precise date is not given.

The case has increased very much in importance since the sale by the commissioners in 1829, on account of the large and valuable erections and improvements made upon that part of the premises which is sought to be recovered. A town has sprung up on the bay, called Key Port, containing a population of several hundred inhabitants, with their dwellings, public edifices, docks, or wharves; and a great portion of the property has passed into the hands of *bonâ fide* purchasers.

These six lots were purchased at the commissioners' sale by a company organized pending the sale, and who made the purchase with a view to the laying out and establishment of a town at that point on the bay; and after the confirmation by the court in the name of the bidders, it was agreed between all persons interested in the purchase, and the commissioners, that these lots should be conveyed to John I. Taylor, one of the company, in trust for the owners, on account of the greater convenience in granting town lots, after the town should be laid out and these lots put into the market. The deed was executed accordingly. But, it appears that some two years subsequent to this conveyance, it was decided by the Supreme Court of New Jersey, (1 Greene's R. 182,) that a deed made by the commissioners in partition to any one, other than the person reported as the purchaser, was void. The law was supposed to be otherwise in New Jersey down to this decision, as it is in several of the States. 5 Page, 620; 1 Dana, 261; 2 Dev. & B. 103; 11 Id. 616. The title was first attacked solely on account of this flaw. It led to the institution of the actions of ejectment. The

defendants, however, applied to the legislature for relief, and in March, 1841, a general act was passed, providing, upon proof being made to the satisfaction of the court or jury before whom such deed was offered in evidence, that the lands were sold fairly, and without fraud, and the deed executed in good faith, and for a sufficient consideration; and with the consent of the persons reported as purchasers, the deed should have the same effect as though it had been made to the purchaser.

This act, as is admitted, is unobjectionable, and cured this defect in the deed; and the case, therefore, is brought down to the simple question of fraud, actual or constructive, at the commissioners' sale.

The whole of the evidence to be found in the record, except what may be derived from the pleadings, bearing upon this question, consists in notes of the testimony taken by the counsel in two trials in the ejectment suits, the one in October, 1842, and the other, in April, 1844. These notes, being an abridgment of the testimony of the witnesses at these trials, are not always free from obscurity and doubt as to the meaning, and having been taken by the opposing counsel are, in some instances, inconsistent, and contradictory. But, upon an attentive examination of them, and making all due allowance for the circumstances under which they were taken, we are satisfied, the clear weight of the evidence is against the charge of actual fraud in the proceedings before the Orphans' Court, or in the commissioners' sale.

An attempt was made on the argument to impeach the good faith of the report of the commissioners, which recommended a sale of the property instead of making partition. But it is not pretended, that the report contained any facts bearing upon this question which were untrue or had the effect to mislead the judgment of the court. The law authorizes a sale, when the land is so circumstanced, that, in the opinion of the commissioners, partition cannot be made without great prejudice to the owners, and upon satisfactory proof of that fact being made to the court. The commissioners caused a survey, and map of the premises to be made which accompanied their report, and they express the opinion, after an examination of the same, the partition could not be made without injury to the owners. We may presume the judges had satisfactory evidence before them that this opinion was well founded before they granted the order of sale; for, until some facts are shown going to impeach it, and with which the commissioners or parties interested were privy, such is the legal effect of the order.

Besides, if this question could be regarded as an open one now, in the absence of any evidence going to impeach the order

of the Orphans' Court, the result would not be changed; for every witness examined on the subject concurs in the opinion that the farm could not have been divided among the heirs without great prejudice to their interest.

By the law of New Jersey, and the order of the court, the commissioners were required to give sixty days' notice of the sale, by posting advertisements in five of the most public places, and publishing the same in one newspaper in the county. The commissioners, in conjunction with Joseph Taylor, the guardian of the infant children, in addition to this notice, caused the sale to be published in two newspapers in the city of New York, and also published and circulated some one hundred handbills throughout the country. The greatest pains seem to have been taken to give the widest publicity of the day and place of sale, and to secure the fullest attendance of bidders. The farm was divided into fifteen allotments, and, according to the evidence, in the most judicious manner for the purposes of the sale, and which were struck off, not only at full prices, but at prices considerably exceeding the highest estimate of those well acquainted with the premises. On this subject the evidence is all one way. Every witness, to whom the question is put, affirms the fact: The highest estimate of value is $15,000. The sales amounted to $19,941.19. The highest rent the farm had previously brought was $300 per annum, for most of the time it had been rented for $260. The soil was light, sandy, and unproductive, and it is agreed, by all the witnesses who speak on the subject, that, independently of the improvements made since the sale, it would not, at the time they were speaking, sell for more, if for as much, as it had brought at the commissioners' sale.

This may account for the circumstance, that the bill of complaint is not filed to set aside the sale of the entire farm, but only as to that portion of it upon which the large and valuable improvements have been made, and the parts connected with it; as, independently of these, there can be no inducement to disturb the sale. Success would be rather a misfortune.

The reason why the premises sold for some $5000 over the estimates and expectations of those best acquainted with them, was owing to the fact, that some enterprising men in the neighborhood foresaw that the Raritan Bay, at that point, was capable of being made a port of some business; and that, by an expenditure of sufficient capital to accomplish this, a town might be built up, which would afford a remuneration for the outlay, and the port afford convenience and facilities to the people of that neighborhood, as well as, probably, add something to the value of their property. The practicability of this scheme was the inducement held out by the commissioners and guardian of

the infants, and persons immediately interested in the property, to the purchasers; and, as is manifest upon the proof, furnished the leading motive for competition in the biddings at the sale. This enterprise, however, required a considerable outlay of capital in the construction of docks, or wharves, and in the erection of a warehouse, and other edifices, for the accommodation of the public, beyond the means of any individual in that somewhat retired locality, or of any one who might be inclined to take an interest in it. To overcome this difficulty, those interested in the sale, and who were desirous the property should bring the highest price, exerted themselves to form an association or company, composed of persons in the neighborhood who had a common and general interest in the object in view, viz. the building up of this little port and town, for the purpose of bidding in the property, and engaging in the enterprise. Holmes, the owner of one seventh, H. N. Kearney, one of the heirs, and Joseph Taylor, the guardian of the minors, were more or less active in getting up this association, and no doubt with the knowledge and approbation of the commissioners.

There was, also, another circumstance that operated in the formation of this company. A little port and town had sprung up at a neighboring point on the bay called Middletown point; and it was given out that the people of this town had associated to bid off the site of this new one at the sale, in contemplation and with a view to prevent a rival place of business in that vicinity.

Under these circumstances, the company in question was formed, and bid at the sale in competition with the Middletown point association; and, being the highest bidders, the property was struck off to them.

There are some cases deriving their principles from the severe doctrines of Bexwell v. Christie, Cowp. 396, and Howard v. Castle, 6 T. R. 642, to be found in books of high authority in this country, that would carry us the length of avoiding this sale, simply on the ground of this association having been formed for the purpose of bidding off the premises, for the reason that all such associations tend to prevent competition, and thereby to a sacrifice of the property. 3 Johns. Cases, 29; 6 Johns. Rep. 194; 8 Id. 444; 13 Id. 112; 2 Ham. 505; 5 Halst. 87; 2 Kent, 539; 1 Story's Eq. Jur. § 293. Later cases, however, have qualified this doctrine, by taking a more practical view of the subject and principles involved, and have placed it upon ground more advantageous to all persons interested in the property, while at the same time affording all proper protection against combinations to prevent competition. 2 Dev. 126; 3 Metc. 384; 25 Maine Rep. 140; 2 Const. Rep. (S. C.) 821; 3 Ves. 625; 12 Id. 477; 11 Serg. & Rawle, 86.

Kearney et al. *v.* Taylor et al.

It is true that in every association. formed to bid at the sale, and who appoint one of their number to bid in behalf of the company, there is an agreement, express or implied, that no other member will participate in the bidding; and hence, in one sense, it may be said to have the effect to prevent competition. But it by no means necessarily follows that if the association had not been formed, and each member left to bid on his own account, that the competition at the sale would be as strong and efficient as it would by reason of the joint bid for the benefit and upon the responsibility of all. The property at stake might be beyond the means of the individual, or might absorb more of them than he would desire to invest in the article, or be of a description that a mere capitalist, without practical men as associates, would not wish to encumber himself with. Much of the property of the country is in the hands of incorporated or joint-stock companies; the business in which they are engaged being of a magnitude requiring an outlay of capital that can be met only by associated wealth. Railroads, canals, ship channels, manufacturing establishments, the erection of towns, and improvement of harbors, are but a few of the instances of private enterprise illustrating the truth of our remark. It is apparent that if, for any cause, any one of these or of similar masses of property, should be brought to the stake, competition at the sales could be maintained only by bidders representing similar companies, or associations of individuals of competent means. Property of this description cannot be divided, or separated into fragments and parcels, so as to bring the sale within the means of individual bidders. The value consists in its entirety, and in the use of it for the purposes of its original erection; and the capital necessary for its successful enjoyment must be equal not only to purchase the structures, establishments, or works, but sufficient to employ them for the uses and purposes for which they were originally designed.

These observations are sufficient to show that the doctrine which would prohibit associations of individuals to bid at the legal public sales of property, as preventing competition, however specious in theory, is too narrow and limited for the practical business of life, and would oftentimes lead inevitably to the evil consequences it was intended to avoid. Instead of encouraging competition, it would destroy it. And sales, in many instances, could be effected only after a sacrifice of the value, until reduced within the reach of the means of the individual bidders.

We must, therefore, look beyond the mere fact of an association of persons formed for the purpose of bidding at this sale, as it may be not only unobjectionable, but oftentimes merito-

rious, if not necessary, and examine into the object and purposes of it; and if, upon such examination, it is found, that the object and purpose are, not to prevent competition, but to enable, or as an inducement to the persons composing it, to participate in the biddings, the sale should be upheld — otherwise if for the purpose of shutting out competition, and depressing the sale, so as to obtain the property at a sacrifice.

Each case must depend upon its own circumstances; the courts are quite competent to inquire into them, and to ascertain and determine the true character of each.

Applying these principles to the sale before us, it is quite clear, upon the evidence, that it should be maintained. The leading motive of the association, and purchase, was the construction of a little port and town upon the bay in their neighborhood, which, it was believed, besides the convenience afforded to their business transactions, would tend to enhance the value of the property in the vicinity. The association was composed, chiefly, of the farmers in the neighborhood, who had not the means individually to meet the expenses of the enterprise, as the necessary outlay, to afford any chance of success, would be considerable. Hence the agreement to join in the purchase and in the expense. From ten to twelve thousand dollars were, in point of fact, laid out by the company at an early day, in the construction of a dock, warehouse, and tavern-house, with a view to the encouragement of the settlement of the town. The members composing it did not regard the purchase as a speculation of any great value at the time, as three of them sold out their interest soon afterwards at an advance only of from twenty-five to forty dollars each, and others withdrew from it. Holmes, one of the most active in getting it up, sold his interest for $25, and H. N. Kearney, one of the heirs, his, for $40. And, as appears from the evidence, none of the parties concerned in the purchase, and in the building up of the town, have made profits of any account out of the enterprise. It has been, as a whole, rather an unfortunate concern, aside from the costs of this litigation, and the chances of losing the town itself, with all its erections and improvements, as the final result of it.

The only fortunate parties concerned, are the heirs, who have realized a very large price for their property — a price which, it is admitted upon the evidence, it would not sell for at the present time, aside from the new and expensive improvements. They had rented it, for a series of years, at $260 a year. The proceeds of the sale, at interest, produces nearly $1400 per annum. Each heir had been in the receipt of less than $40 a year, as his or her share of the rent since the sale, nearly

44*

$200 each, thus receiving an annual income equalling almost, if not quite, the net entire income of the seven.

We are satisfied that no actual fraud has been shown in the case, and that the sale cannot be disturbed on this ground.

Then, is the sale void, and liable to be set aside on the ground of constructive fraud ?

It is said that the commissioners, and guardian of the minor children, were interested in it, and that from the relation in which they stood to the property, and to the heirs, this interest infected the purchase with illegality as matter of law, so as to compel a court of equity to set it aside. Admitting the facts to be true, the conclusion is not denied. But the answer is, the proofs fail to make out the allegation. Taylor, the guardian, and two of the commissioners, James Hopping and Leonard Walling, took an interest in the company some three months and more after the sale, namely, in the February following. Taylor bought out the interest of Holmes, for which he gave him an advance of forty dollars. Leonard Walling took the interest of Stevens, and James Hopping of another of the members, at the same time. The company were then about commencing the improvements with a view to the laying out of the town and construction of the dock or wharf. This is the first time these persons are spoken of in the evidence as having any interest in the concern, and these are the circumstances under which it was taken. The three died some years before the institution of this or of the ejectment suits, and we have not, therefore, the benefit of their explanation. Taylor, the guardian, died in 1836, and Hopping and Walling, the two commissioners, a year or two later. Edward Taylor, the only surviving commissioner, was examined as a witness in the ejectment suit, and expresses his confident belief that neither of these persons had any interest in the purchase at the time of the sale, and has again affirmed the same in his answer to this bill. The fact is denied in the answers of all the defendants; and there is not only no proof to contradict it, but affirmative evidence, as we have seen, sustaining the answers in this respect. Doubtless, if these persons were living, and we could have had the benefit of their own account of the matter, the explanation would have been more full and satisfactory. But the circumstance should not operate to the prejudice of the defendants. The delay in the commencement of the litigation and in the impeachment of the conduct of three of the principal parties to the transaction, until after their decease, is alone attributable to the complainants. It would be unjust to indulge in presumptions against the fairness of their conduct under such circumstances.

It has been said, also, that inasmuch as the trust imposed upon

Kearney et al. *v.* Taylor et al.

these commissioners had not expired at the time they became interested in the company in February, 1830, even admitting their interest then commenced, the case is still within the principle, forbidding the trustee to purchase. The one half of the purchase-money was to be received from the purchasers on the first of April thereafter; and the security to be taken for the remainder. But, we think this conclusion would carry the application of the principle beyond the reason upon which it is founded. The only consequence of the interest taken in the purchase by the commissioners at this period was to subject themselves personally to the first payment of the purchase-money, which we do not see could operate prejudicially to the heirs.

It is also said that Primrose Hopping, the auctioneer at the sale, was interested in the company, and hence a purchaser, and, that for this reason the sale should be set aside. We are free to admit, if it clearly appeared that he was one of the association, who bid off the property at the time of the sale, there would be very great difficulty in upholding it, even in the absence of any actual fraud in the case. The reasons for this conclusion are too obvious to require explanation. We have accordingly looked with some care and interest into the record, for the purpose of ascertaining whether this allegation is well founded, and although we regard this as the most doubtful and unsatisfactory portion of the defence, and one upon which different minds might arrive at different results, in this very complicated and confused mass of pleadings and of proofs, yet, the inclination of our mind after the most attentive examination is, that he was not a member of the association, and had no interest in it at the time the sale took place. Primrose himself was a witness in the ejectment suits and denies his interest, and this is substantially confirmed by Holmes, the most active man in getting up the company. Some of the answers admit, upon information and belief, others more directly, while some deny, that Primrose was a member of the company. The truth is, the association was got up suddenly by a mere verbal understanding at the time, and no one seems to have known with any certainty the exact number or persons comprising it. Hence scarcely any two of the defendants in their answers, or witnesses agree, as to the individuals engaged in it. Mr. Lippencott, who appears to have been one of the most intelligent and responsible members, says, in his answer, that the particular persons concerned in it were not finally settled upon or fixed until about the time the first payment of the purchase-money in April; and this is the first time he mentions Primrose as having become a member. As we have already said, the evidence in the case consisting of the

notes of the opposite counsel in the ejectment suits, is very much abridged, and some parts of it of doubtful meaning, and frequently inconsistent and contradictory; but we think the fair construction and weight of it confirms the testimony of Primrose himself. It is very probable, and indeed is virtually admitted by himself, that he was aware at the time of the sale, he could have an interest in the company if he wished; and, if this was a case that fairly admitted the question of actual fraud to be raised, this expectation, or contemplation of a possible future interest, would be entitled to great weight. But, in the absence of actual fraud, and with the admitted fact, that the property was sold not only for a full, but, for a very large price, and which the heirs have received, and been in the enjoyment of for the last eight or ten years, we think it would be pressing the principle of constructive fraud to a refinement in its practical application, beyond the reason of it, as it certainly would be in utter subversion of the justice in the particular case, to concede to it the effect claimed.

The conduct of the auctioneer is also impeached in respect to the biddings upon lot No. 8, one of the most valuable lying on the bay, and in striking it off to the bidder on behalf of this company. But nearly all the witnesses examined on this subject concur in disproving the charge.

Taylor, the only surviving commissioner, and who has never had any interest in the premises in dispute, and was superintending the sale at the time, says the lot was cried audibly several times to get another bid after the bidding had ceased; and that, after it was thus cried, timely notice was given by the auctioneer, that if none other was made, it would be struck off.

It is also said that, after bids had been made upon this lot the first day of the sale, the sale was stopped, and adjourned until the next day. But all the witnesses agree, that this was for the purpose of preventing a sacrifice of the property, and to secure greater competition. The bid was at twenty-eight dollars per acre when the adjournment took place. The next day it sold for forty-three dollars per acre.

Without pursuing the case further, we are satisfied that the decree below in favor of the defendants is right, and should be affirmed.

Mr. Justice McLEAN, Mr. Justice WAYNE, and Mr. Justice CURTIS dissented.

## Order.

This cause came on to be heard on the transcript of the record

from the Circuit Court of the United States for the District of New Jersey, and was argued by counsel.   On consideration whereof, it is now here ordered, adjudged, and decreed by this court, that the decree of the said Circuit Court in this cause be, and the same is hereby, affirmed, with costs.