**Betty G. AMOS and Estate of Thomas R. Righetti, Plaintiffs–Appellants and Cross–Appellees,**

v.

**ASPEN ALPS 123, LLC and Equitable Bank, Defendants–Appellees and Cross–Appellants.**

**No. 08CA2009.**

Colorado Court of Appeals, Div. IV.

Jan. 7, 2010.

As Modified on Denial of Rehearings Feb. 18, 2010.

Holland & Hart LLP, Wiley Mayne, Jr., Christopher Heaphey, Denver, Colorado, for Plaintiff–Appellants and Cross–Appellees.

Garfield & Hecht P.C., Matthew Ferguson, Christopher Bryan, Aspen, Colorado, for Defendant–Appellee and Cross–Appellant Aspen Alps 123, LLC.

Duncan Ostrander & Dingess, P.C., Richard Rodriguez, James Birch, Denver, Colorado, for Defendant–Appellee and Cross–Appellant Equitable Bank.

Opinion by Judge WEBB.

In this action seeking to set aside a public trustee foreclosure, plaintiffs, Betty G. Amos (Amos) and the estate (Estate) of Thomas Righetti (Righetti), her late husband, the former owners, appeal from a summary judgment in favor of defendant, Equitable Bank (Bank), the foreclosing creditor; a judgment in favor of intervenor, Aspen Alps 123, LLC (AA123), the purchaser, following a bench trial; and attorney fees awards to both the Bank and AA123. We reverse the attorney fees awarded to AA123; reverse the trial court's judgment quieting title in AA123, and remand for the trial court to determine whether the foreclosure should be set aside. We otherwise affirm.

I. Facts

This case involves a condominium unit in Aspen jointly owned by Amos and Righetti, who executed a deed of trust on the unit for the benefit of the Bank. When Righetti died in 2002, Amos and his daughter, Brandy Righetti, were named copersonal representatives of the Estate, which now holds Righetti's interest in the unit.

In 2006, based on an undisputed loan default, the Bank initiated foreclosure through the public trustee, who is not a party to this appeal, and commenced a C.R.C.P. 120 proceeding for an order authorizing sale. Amos, who was then represented by counsel, received timely notice of the C.R.C.P. 120 proceeding in her individual capacity. Brandy Righetti did not receive any notice. Neither Amos nor the Estate opposed the order authorizing sale.

The public trustee held the foreclosure sale on February 28, 2007. Neither Amos nor the Estate submitted a bid. After the Bank bid the amount of its debt, three persons bid competitively until the bid was $1.86 million. Then they agreed to stop bidding and form AA123 to purchase the condominium unit.

According to Amos, she mailed a letter to the public trustee as notice of intent to redeem on April 6, well before the redemption notice deadline. However, the public trustee never received the letter. Amos's attorney notified the public trustee on May 8 of her intention to redeem, nine days beyond the notice deadline. Although Amos wired the necessary funds on the May 14 redemption date, based on direction from AA123, the public trustee did not allow her to redeem.

Amos brought this action against the public trustee and the Bank to enjoin issuance of the deed to AA123 and to compel the public trustee to allow her to redeem, and she recorded a notice of lis pendens. After a hearing, the trial court refused to enter a preliminary injunction, finding that the April 6 letter was back dated and probably had never been mailed. The public trustee issued the deed to AA123 on August 14. On August 27, Amos recorded a second notice of lis pendens.

Amos proceeded on two claims: she had substantially complied with the redemption procedures and the Bank had failed to strictly comply with the notice requirements of C.R.C.P. 120 as to the Estate. AA123 filed counterclaims to quiet title in its favor, as well as for damages and attorney fees under section 38–35–109(3), C.R.S.2009, under section 38–35–204, C.R.S.2009, and based on slander of title. On summary judgment, the C.R.C.P. 120 claim was decided in favor of the Bank.

Shortly before trial, Amos added an allegation of illegal bid rigging by the principals of AA123 at the foreclosure sale. The trial court accepted this allegation only as a defense to the quiet title counterclaim. At trial, her redemption claim was dismissed under C.R.C.P. 41(b).

After trial, the court entered a detailed order holding that the principals in AA123 had not engaged in bid rigging and quieted title in favor of AA123. It awarded AA123 attorney fees against both Amos and the Estate on the bases that the two lis pendens were spurious documents and slandered title to the condominium unit. It also awarded the Bank attorney fees against both Amos and the Estate under a pledge agreement signed by Amos.

## II. Defects in the C.R.C.P. 120 Notice to the Estate Do Not Require That the Foreclosure Sale be Voided

■ Amos first contends the Bank failed to strictly comply with the notice requirements of C.R.C.P. 120; the trial court erred in holding that the Bank had to comply only with the public trustee's notice obligations under section 38–38–505, C.R.S.2009; and voiding the foreclosure sale is the proper remedy.[1] We agree with the trial court that C.R.C.P. 120 requires strict compliance and that the Bank did not do so as to the Estate. However, we conclude that section 38–38–505 does not supplant the notice requirements of C.R.C.P. 120 and that undisputed actual notice to the Estate precludes a remand to set aside the sale.

The trial court found, with record support, that the Bank gave Amos notice in her individual capacity; Amos received it timely; the address where notice was sent to Righetti, who had been deceased for several years by this time, was incorrect; and Brandy Righetti was not sent any notice.

In dismissing Amos's C.R.C.P. 120 claims on summary judgment, the court reasoned

that the Estate was not entitled to notice under C.R.C.P. 120 because the Estate's interest was not of record when the Bank moved for an order authorizing sale under C.R.C.P. 120, and section 38–38–505(2) excuses the public trustee from giving notice to a personal representative "unless the claim or interest of such person then appears of record."

We review a summary judgment de novo. *Natural Energy Resources Co. v. Upper Gunnison Water Conservancy Dist.*, 142 P.3d 1265, 1276 (Colo.2006). Statutory interpretation is also reviewed de novo. *Stamp v. Vail Corp.*, 172 P.3d 437, 442 (Colo.2007).

We construe statutes to effect legislative intent, starting with the language, and giving words and phrases their ordinary meaning. *Spahmer v. Gullette*, 113 P.3d 158, 162 (Colo. 2005). If the language is unambiguous, we apply it as written unless the result would be absurd. *Garhart ex rel. Tinsman v. Columbia/Healthone, L.L.C.*, 95 P.3d 571, 591 (Colo. 2004); *see* § 2–4–201(1)(c), C.R.S.2009. Court rules are subject to the same principles of interpretation as statutes. *Leaffer v. Zarlengo*, 44 P.3d 1072, 1078 (Colo.2002).

C.R.C.P. 120 includes notification requirements to obtain an order authorizing sale for, among other proceedings, public trustee foreclosures. It specifies the persons whose addresses must be provided to the C.R.C.P. 120 court by the party seeking an order authorizing sale:

When the property to be sold is real property and the power of sale is contained in a deed of trust to a public trustee, the motion shall state the name and last known address, as shown by the records of the moving party, of the grantor of such deed of trust, of the current record owner of the property to be sold, and of any person known or believed by the moving party to be personally liable upon the indebtedness secured by the deed of trust, as well as the names and addresses of those persons who

---

1. For the first time in her reply brief, Amos raises the trial court's finding that the Bank did not send notice by certified or registered mail, as required in the deed of trust, but asserts she was not required to address this issue in her opening brief because the trial court's summary judgment order resolved this issue in her favor. We disagree. Because the trial court afforded Amos no relief on this ground, she was required to raise the issue in her principal brief. *In re Marriage of Smith*, 7 P.3d 1012, 1017 (Colo.App.1999). Therefore, it is not properly before us.

appear to have acquired a record interest in such real property. . . .

C.R.C.P. 120(a).

### A. The Trial Court Misapplied Section 38–38–505(2)

■ Section 38–38–505, which governs the conduct of the public trustee in foreclosure proceedings involving interests of deceased or incapacitated individuals, provides in pertinent part:

> The public trustee shall not be required to give notice of such foreclosure proceedings to any heir-at-law, legatee, devisee, creditor, conservator, guardian, personal representative, executor, or administrator of any decedent or mental incompetent or incapacitated person or to any person claiming by, through, or under any decedent or mental incompetent or incapacitated person unless the claim or interest of such person then appears of record.

§ 38–38–505(2).

The statute predates C.R.C.P. 120, which governs a "very specialized civil proceeding." *Plymouth Capital Co. v. Dist. Court,* 955 P.2d 1014, 1015 (Colo.1998). It has never been amended to cover the responsibilities of a party seeking an order authorizing sale under C.R.C.P. 120. Neither C.R.C.P. 120 nor the Committee Comment for that rule mentions section 38–38–505. The Bank cites no authority, nor have we found any, applying the statute to define or limit notice responsibilities under C.R.C.P. 120.

The Bank argues that section 38–38–505 and C.R.C.P. 120 are "coexistent and consistent" because they contain similar language and the Supreme Court Committee on the Rules of Civil Procedure did not reference nor propose any changes to section 38–38–505. But lack of a statutory reference in the Comment does not subordinate the rule to the statute. We fail to see how these observations, without more, authorize supplanting the requirements of C.R.C.P. 120 with those of the statute.[2]

Accordingly, we conclude that section 38–38–505 is irrelevant to the notice requirements of C.R.C.P. 120.

### B. Absent Prejudice, Lack of Strict Compliance with C.R.C.P. 120 Does Not Require That the Foreclosure Be Voided

■ C.R.C.P. 120 establishes judicial supervision of public trustee foreclosures. *Princeville Corp. v. Brooks,* 188 Colo. 37, 40–41, 533 P.2d 916, 918 (1975). It affords interested persons due process by preventing ex parte taking of property without notice and a hearing. *Moreland v. Marwich, Ltd.,* 665 P.2d 613, 617 (Colo.1983).

*Dews v. District Court,* 648 P.2d 662, 664 (Colo.1982), holds that "[t]he provisions of [C.R.C.P.] 120 must be strictly complied with by one seeking foreclosure under a power of sale through the public trustee." The Bank cites no contrary Colorado authority. We are bound by supreme court precedent. *See People v. Close,* 22 P.3d 933, 936 (Colo.App. 2000), *aff'd,* 48 P.3d 528 (Colo.2002).

Here, Righetti, as a grantor of the deed of trust, should have been sent notice at the address shown in the Bank's records. This did not occur because, as the trial court found and the Bank does not dispute, it sent notice to the wrong address. Because of Righetti's death, harm, if any, was to the Estate.

The trial court made no finding whether the Bank's records showed that the Estate was either liable on the debt or a current co-owner, nor what addresses, if any, the Bank had for the Estate, apart from various addresses for Amos. However, at oral argument the Bank conceded that it knew Righetti was dead and that Brandy Righetti was a copersonal representative of the Estate. But even assuming that C.R.C.P. 120 obligated the Bank to provide notice to the Estate and that it had addresses to do so other than through Amos, we conclude that the Estate is not entitled to void the foreclosure sale because

---

**2.** The Bank misreads *Montoya v. Connolly's Towing, Inc.,* 216 P.3d 98, 102 (Colo.App.2008), to elevate statutory provisions over court rules in all circumstances. Rather, in *Montoya,* as here, the rule and the statute were independent of each other. *Id.* at 103. Hence, the principle that statutes prevail over conflicting court rules did not apply.

it received actual notice and cannot show prejudice.[3]

In *Dews,* 648 P.2d at 662, co-debtors challenged an order authorizing sale under C.A.R. 21. The supreme court held that the C.R.C.P. 120 proceeding against them did not meet the statutory requirement of notice being mailed at least fifteen days before the hearing. *Id.* at 664. In a footnote, the court observed that failure to comply had impaired the co-debtors' due process rights because they had only one or two business days to present their objections and six or seven business days to prepare for the hearing. *Id.* at 663 n. 2. Thus, *Dews* does not resolve whether relief should be granted if a debtor received timely actual notice and was not prejudiced.

Further, *Dews* did not void a completed foreclosure sale. Instead, the court remanded for a new C.R.C.P. 120 hearing. *Id.* at 664. Hence, *Dews* also does not resolve what weight should be given to finality of title obtained through purchase at a foreclosure sale, since the purchaser cannot know whether, as here, the party initiating the proceeding failed to comply with the C.R.C.P. 120 notice requirements that are based on information in the initiating party's files.[4]

■ "In determining whether a statutory notice requirement has been satisfied, courts require a degree of compliance consistent with the objective sought to be achieved by the legislation under consideration." *Group, Inc. v. Spanier,* 940 P.2d 1120, 1122 (Colo. App.1997). C.R.C.P. 120 affords debtors an opportunity to contest the default underlying the foreclosure. *See Goodwin v. Dist. Court,* 779 P.2d 837, 842 (Colo.1989); *Dews,* 648 P.2d at 664 ("the hearing must provide the allegedly defaulting party an 'opportunity to be heard at a meaningful time or in a meaningful manner' " (quoting *Valley Dev. v. Warder,* 192 Colo. 316, 319, 557 P.2d 1180, 1182 (1976))).

Therefore, we discern no reason in Colorado law why a completed foreclosure must be set aside where the complaining party received timely actual notice and as a result the right to contest the default was not prejudiced. *Cf. People ex rel. State Bd. of Equalization v. Hively,* 139 Colo. 49, 79–80, 336 P.2d 721, 737 (1959) (formal notice not required where statutory provisions were mandatory, but taxpayers received actual notice of tax assessment adjustments and could not demonstrate prejudice). To interpret C.R.C.P. 120 as requiring that a foreclosure be set aside without considering the harm, if any, caused by a notice defect, would be unreasonable.

Both parties cite out-of-state authority on the tension between strict compliance with notice requirements and lack of prejudice because actual notice was timely received. The few jurisdictions to have addressed whether the standard for foreclosure notification is actual notice or strict compliance are divided. *Compare Koegel v. Prudential Mut. Sav. Bank,* 51 Wash.App. 108, 752 P.2d 385, 387 (1988) (strict compliance not controlling where debtor failed to show prejudice); *Lehner v. United States,* 685 F.2d 1187, 1190–91 (9th Cir.1982) (same); *Vilca v. Village of Port Chester,* 255 A.D.2d 593, 681 N.Y.S.2d 291, 292 (N.Y.App.Div.1998) ("[l]ack of technical compliance with" statutory tax foreclosure proceeding requirements "is necessarily fatal ... only where the failure to comply with the statute was the reason the property owner did not receive the notice to which he or she was entitled"), *with Equivest Ltd. Partnership v. Foster,* 253 Mich.App. 450, 656 N.W.2d 369, 374 (2003) ("[w]e ... feel constrained to" require strict compliance with tax sale notice provisions, "even if doing so produces anomalous results"); *Security Pacific Finance Corp. v. Bishop,* 109 Idaho 25, 704 P.2d 357, 359 (1985) (strict compliance with deed of trust foreclosure statutes required); *Ameribank v. Quattlebaum,* 269

---

3. We decline to revisit the trial court's conclusion that the Estate had no record interest in the condominium unit. Even if the Estate had such an interest and was entitled to notice under C.R.C.P. 120 on that basis, the same lack of prejudice analysis would preclude the relief sought.

4. "Challenging the trustee's deeds after the sale undermines the policy of land title stability." *Amresco Independence Funding, Inc. v. SPS Properties, LLC,* 129 Wash.App. 532, 119 P.3d 884, 887 (2005).

Ga. 857, 505 S.E.2d 476, 478 (1998) (strict compliance required even though "departure may not result in injustice in this case").

But both approaches are rooted in due process. *See, e.g., Vilca,* 681 N.Y.S.2d at 292 ("[S]trict technical compliance with each statute in the notification scheme is not constitutionally mandated if there is actual notice, which is the goal of such a scheme."); *Security Pacific Finance Corp.,* 704 P.2d at 359 (strict compliance required "in order to satisfy the due process requirements of notice and opportunity to be heard"). We have not found a case, nor has one been cited, holding that due process requires inquiry into strict compliance with notice requirements, regardless of actual notice.

The out-of-state authority cited by Amos for the proposition that a strict compliance standard precludes inquiry into actual notice and prejudice is unpersuasive, for three reasons.

First, Amos primarily cites service of process cases, which are distinguishable because such service both provides notice and establishes personal jurisdiction. *See Hoyle v. United Auto Workers Local Union 5285,* 444 F.Supp.2d 467, 474 (W.D.N.C.2006); *U.S. Bank v. Vanvliet,* 24 A.D.3d 906, 805 N.Y.S.2d 459, 461 (N.Y.App.Div.2005).

■ In contrast, C.R.C.P. 120(b) requires only notice by mail to comply with due process. It does not establish jurisdiction for the exercise of judicial power over the persons entitled to notice. *See Plymouth Capital Co.,* 955 P.2d at 1017 (despite valid C.R.C.P. 120 order authorizing sale, debtor can still challenge foreclosure).

Second, some of the strict compliance cases cited turn on insufficiency of actual notice. *Security Pacific Finance Corp.,* 704 P.2d at 360, required strict compliance because, although the debtor had actual notice that he was being foreclosed on, the record did not show that the failed attempts at notice had given him actual notice of the date, time, and place of the foreclosure proceedings and sum owing. *See also Ameribank,* 505 S.E.2d at 478 (creditor responsible for notification erroneously informing debtor

he need not attend foreclosure confirmation overrode actual notice).

Third, cases such as *Equivest Ltd. Partnership* fail to explain *why* a strict compliance standard necessarily forecloses inquiry into actual notice or prejudice. A court should be reluctant to adopt a rule without a reason, especially where doing so would elevate form over substance. *Knapp v. Doherty,* 123 Cal.App.4th 76, 20 Cal.Rptr.3d 1, 15 (2004) ("courts have rejected claims of deficient notice where no prejudice was suffered as a result of the procedural irregularity," reasoning "[w]e refuse to elevate form over substance") (internal quotations omitted); *see also Carpenter v. Young,* 773 P.2d 561, 566–67 (Colo.1989).

In contrast, cases cited by Amos upholding foreclosures based on actual notice and lack of prejudice, despite lack of strict compliance, align with the recognition that the touchstone of due process is actual notice. *See Barham v. University of Northern Colorado,* 964 P.2d 545, 550 (Colo.App.1997) ("The essence of procedural due process is fundamental fairness. This embodies adequate advance notice and an opportunity to be heard...."). Hence, they are more persuasive. *See, e.g., Koegel,* 752 P.2d at 387 (although notice did not strictly comply, relief denied because debtor failed to show prejudice); *Lehner,* 685 F.2d at 1190–91 (strict compliance not required where the debtor "knew the foreclosure sale was imminent" and made "no suggestion that the written notice would have supplied information not already known to her").

Therefore, we look to actual notice and prejudice. For the following reasons, we conclude that the record shows no prejudice to the Estate resulting from the Bank's failures to correctly address notice to Righetti, to send notice to Amos in her capacity as copersonal representative, and to provide any notice to Brandy Righetti.

■ The Estate had been opened before the Bank commenced the C.R.C.P. 120 proceeding, so any interest of Righetti lies in the Estate. Notice to an agent is notice to the principal. *See generally Stortroen v. Beneficial Fin. Co.,* 736 P.2d 391, 396 (Colo.1987); *see also Weber v. Snyderville West,* 800 P.2d

316, 318 (Utah Ct.App.1990) (distinguishing that partnership would receive notice by service on a partner, but partnership could not thereby be vicariously served process). For reasons previously discussed, service of process cases cited by Amos, such as *Bush v. Winker*, 907 P.2d 79, 83 (Colo.1995) (where partnership was referenced in complaint but not named nor identified as a defendant, process deemed not served on partnership), are inapposite.[5] Hence, because Amos received actual notice, the Estate had constructive notice.

The trial court found—and the Estate does not dispute—that the loan identified in the Bank's motion for order authorizing sale was in default. Thus, the Estate could not have opposed the order authorizing the sale by challenging the default. *Goodwin*, 779 P.2d at 842.

Moreover, as co-personal representative, Amos had a fiduciary duty to the Estate. § 15–12–703(1), C.R.S.2009. If Amos breached this duty by failing to inform the Estate of the foreclosure, its remedy is against her, not in voiding the foreclosure sale to the detriment of AA123, which had no role in the notice defect.

Accordingly, we conclude that defects in notice to the Estate under C.R.C.P. 120 do not require us to set aside the foreclosure.

### III. Amos Did Not Have a Right to Redeem

■ Amos next contends Colorado's statutory redemption procedures require only substantial compliance rather than strict compliance, and she substantially complied. We reject the first contention and thus need not reach the second.

The trial court rejected Amos's substantial compliance argument when it granted the C.R.C.P. 41(b) motions of AA123, the Bank, and Pitkin County on behalf of the public

trustee after Amos had completed her case-in-chief at trial.

Dismissing a claim under C.R.C.P. 41(b) because the plaintiff has not shown a right to relief is within the discretion of the trial court. *BA Leasing Corp. v. Board of Assessment Appeals*, 653 P.2d 80, 81 (Colo.App. 1982). However, whether strict compliance applies to redemption procedures is a question of statutory interpretation subject to de novo review. *Stamp*, 172 P.3d at 442.

The statutory right to redeem "has long been recognized as a substantive right to be exercised in strict compliance with statutory terms." *Johnson v. Smith*, 675 P.2d 307, 310 (Colo.1984). The redemption statute in effect at the time of this foreclosure provided:

> [W]ithin seventy-five days after the date of the sale of the property by virtue of any foreclosure of a mortgage, deed of trust, or other lien ... the owner of the property ... may redeem the property sold by giving a written notice of the intention to redeem to the public trustee or sheriff conducting the sale at least fifteen calendar days prior to the end of the redemption period....

Ch. 315, sec. 13, § 38–38–302(1)(a), 2002 Colo. Sess. Laws 1331 (now codified with changes to statutory deadlines at § 38–38–302, C.R.S.2009). The public trustee may accept written notice of intention to redeem within the fifteen days before the redemption period ends only if the purchaser at the foreclosure sale consents. *Id.* at (1)(b). The relevant version of subsection (1)(b) provided:

> The public trustee or sheriff conducting the sale may accept a written notice of the intention to redeem and the sum necessary to redeem after fifteen calendar days prior to the end of the redemption period ... upon receipt of written authorization from ... the holder of the certificate of purchase.

---

**5.** Amos's citation to *Ulery–Williams, Inc. v. First Wyoming Bank, N.A.Laramie*, 748 P.2d 740 (Wyo. 1988), does not persuade us otherwise. Unlike here, where Amos received notice as co-owner, in *Ulery–Williams, Inc.* the corporation being foreclosed on was the sole owner, and its agents who received notice in their individual capacities

had no interest in the property. *Id.* at 742. Further, in *Walker v. McAnnany*, 802 P.2d 876, 880 (Wyo.1990), another foreclosure case, the court distinguished *Ulery–Williams, Inc.* for several reasons, including "the actual notice to the appellant."

■ Under appropriate circumstances, a court may exercise its equitable discretion to extend the statutory redemption period. *Moreland,* 665 P.2d at 618 (decision is discretionary). Extending the redemption period is not justified, however, absent fraud, deceit, or collusion by the purchaser. *Johnson,* 675 P.2d at 310. Amos did not argue that the redemption deadline should be extended on this basis.

■ Here, the statute expressly affords the purchaser an absolute right to veto redemption where the redeeming party fails to give timely notice. Amos cites no Colorado case, nor have we found one, limiting the purchaser's right to reject an untimely attempt to redeem. Recognizing substantial compliance would dilute this right, without any meaningful standard. We cannot re-write a statute to effect what may appear to be better public policy in a particular case. *See Waskel v. Guaranty Nat'l Corp.,* 23 P.3d 1214, 1221 (Colo.App.2000).

Accordingly, we discern no error in the trial court's conclusion that Amos failed to timely redeem.

## IV. Bid Rigging

Amos next contends the three bidders at the foreclosure sale engaged in bid rigging contrary to section 6–4–106 of the Colorado Antitrust Act of 1992(Act), §§ 6–4–101 to – 122, C.R.S.2009. According to Amos, because bid rigging is a per se violation, the foreclosure sale must be voided, which would both afford her and the Estate a new opportunity to redeem. We agree that unlawful bid rigging occurred, and remand to the trial court to determine whether setting aside the foreclosure is the appropriate equitable remedy.

Three previously unassociated persons— Seguin, Mayer, and Griffin, who submitted bids for his principal, Flaum—attended the sale. After the Bank submitted the initial bid of $1,597,042.91, the three bidders competitively bid the price up to $1.86 million, which was Seguin's last bid. Then the bidding stopped.

Mayer testified:

When we bid it up to 1.86 [million dollars], Tom Griffin said we could be bidding this up further and further. Why don't we just form an LLC and stop the bidding process. And at that point, Mike Seguin had the last bid at 1.86. And we shook hands in agreement, and the process stopped.

Similarly, the public trustee testified:

The three parties in the sale decided to form, together, to form this LLC.... At the sale they, instead of continue to bid against each other, they decided to form this LLC and purchase the foreclosure together. [sic]

Flaum testified that he had given Griffin authority to bid no more than $1.8 million. Mayer testified that she had no intention of bidding above $1.8 million, as her available funds consisted of a cashier's check for $1.65 million and $100,000 cash. Seguin and Griffin did not testify.

The trial court allowed Amos's bid rigging argument as a defense to AA123's quiet title claim, reasoning that "[i]n order to recover, [AA123] will need to show that the title it holds is valid." However, it rejected the bid rigging defense and found that "the Aspen Alps members were not engaging in illegal activity but were exercising their right to contract." It explained that the agreement was joint bidding rather than bid rigging because:

At the foreclosure sale, Seguin, Mayer and Flaum (via Griffin) were each unable to individually bid any higher that the 1.86 million winning bid. Ms. Mayer was already out of the bidding at the time [they] decided to form the LLC because she was out of funds. Mr. Flaum testified that the winning bid price of 1.86 million already exceeded the $1.8 million which was the maximum amount of authority that Mr. Griffin had to bid. Mr. Seguin's bid of $1.86 million was the highest bid and was made before the agreement to stop bidding and form an LLC to jointly buy the Property was made. There was no criminal intent here. Nor was anyone shut out of the bidding process. They were the only bidders.

Insofar as the distinction between bid rigging and joint bidding is a question of law

involving construction of a statute, we review it de novo. *Freedom Colorado Information, Inc. v. El Paso County Sheriff's Dep't,* 196 P.3d 892, 897 (Colo.2008). To the extent that it is a question of fact, because the testimony about the bidding was undisputed and the trial court made no credibility determinations concerning these witnesses, we are not bound by the trial court's conclusion. *Dynasty, Inc. v. Winter Park Associates, Inc.,* 5 P.3d 392, 393 (Colo.App.2000).

### A. Bid Rigging, Not Joint Bidding, Occurred

■ No Colorado appellate court has addressed section 6–4–106(1), which provides:

It is illegal for any person to contract, combine, or conspire with any person to rig any bid, or any aspect of the bidding process, in any way related to the provision of any commodity or service.

The Act differs from its federal counterpart, the Sherman Act, 15 U.S.C. § 1, in that it specifically prohibits bid rigging. Additionally, the language of section 6–4–106(1), particularly the use of "any person" and "in any way," suggests a broad reading of the instances in which bid rigging applies. *Colorado State Bd. of Accountancy v. Raisch,* 931. P.2d 498, 500 (Colo.App.1996) ("The term 'any' is an inclusive term often used synonymously with the terms 'every' and 'all.'"), *aff'd,* 960 P.2d 102 (Colo.1998).

■ Federal antitrust cases "although not controlling, are entitled to careful scrutiny in resolving issues arising under Colorado's antitrust statute." *People ex rel. Woodard v. Colorado Springs Bd. of Realtors, Inc.,* 692 P.2d 1055, 1061 (Colo.1984); *see also* § 6–4–119, C.R.S.2009.

■ Bid rigging is a per se violation of section 1 of the Sherman Act. *See, e.g., United States v. Koppers Co.,* 652 F.2d 290, 294 (2d Cir.1981). Those courts have construed section 1 to include bid rigging because it represents a "price-fixing agreement of the

simplest kind." *United States v. Bensinger Co.,* 430 F.2d 584, 589 (8th Cir.1970), *superseded on other grounds as stated in DCS Sanitation Mgmt., Inc. v. Occupational Safety & Health Review Comm'n,* 82 F.3d 812 (8th Cir.1996).[6]

Any concern about whether the scope of the Act encompasses a foreclosure sale on a single property is answered by *Bensinger Co.:*

It may well be that this case represents the reductio ad absurdum of the proposition that price-fixing agreements are to be condemned as per se violations. The subject of the conspiracy was only one dish washing machine, and the price at which this $10,000 machine was fixed was only $107 above the dealers' cost. Nevertheless, this court is not willing to say that large price-fixing conspiracies in interstate commerce are violations of the [Sherman Antitrust] Act, while little ones are not; the law condemns them all.

*Id.* Other sections of the Act reinforce a broad application. *See, e.g.,* § 6–4–103(5), C.R.S.2009 (defining "trade or commerce" to be "any and all economic activity carried on wholly or partially in this state which involves or relates to any commodity or service").

■ For these reasons, we conclude that bid rigging is per se illegal under state law, and turn to whether the agreement here constituted bid rigging.

■ Federal antitrust cases distinguish between unlawful bid rigging and lawful joint bidding. Bid rigging has been found when two or more competitors coordinate their bids to a third party. *United States v. Mobile Materials, Inc.,* 881 F.2d 866, 869 (10th Cir.1989). However, "[b]id rigging should not be confused with joint bidding, which allows bidders to pool their resources to place bids on property which they would otherwise be unable to afford." *Love v. Basque Cartel,* 873 F.Supp. 563, 577 (D.Wyo.

---

**6.** Most federal cases applying the bid rigging prohibition are criminal prosecutions against contractors who collude, pre-bid, to rig the bids. *See Bensinger Co.,* 430 F.2d at 589; *United States v. Brighton Bldg. & Maintenance Co.,* 598 F.2d 1101, 1103 (7th Cir.1979). In such cases, "the

measure of damages would ordinarily be the difference between the price actually paid by the State on the contracts and the price it would have paid absent the conspiracy." *New York v. Julius Nasso Concrete Corp.,* 202 F.3d 82, 88 (2d Cir.2000).

1995), *aff'd sub nom. Dry Creek Cattle Co. v. Basque Cartel,* 95 F.3d 1161 (10th Cir. 1996) (unpublished table decision).[7]

In *Love,* 873 F.Supp. at 566, 568, on which the trial court relied, the court determined that the bidding at an auction for a 90,000–acre ranch did not constitute bid rigging because the auction encouraged joint bidding: in early rounds, bids were taken on individual subdivided parcels; in later rounds, bids were taken on the ranch as a whole. *Id.* at 567, 578. The *Love* court concluded that in pooling their resources to bid on the entire ranch, the individual defendants had not suppressed competition as to the individual parcels. *Id.* at 577. And it found no evidence that anyone had been prevented from bidding on the entire ranch. *Id.*

The trial court's reliance on *Love* was misplaced because unlike the two-tiered auction structure in *Love,* here the bidding was on only the condominium unit; the final bid was not accepted in the presence of competitors who were willing to bid more; and that bid, which Seguin submitted in his individual capacity, had not involved pooling resources.

In *United States v. Guthrie,* 814 F.Supp. 942 (E.D.Wash.1993), *aff'd,* 17 F.3d 397 (9th Cir.1994) (unpublished table decision), a bidder who twice paid other bidders not to attend foreclosure sales at which he submitted winning bids for $1 above minimum bid levels was convicted of bid rigging. Although unlike here Guthrie rigged the bids before the sales, the court's explanation of the anticompetitive nature of bid rigging as "an agreement between two or more persons to eliminate, reduce, or interfere with competition for a job or contract that is to be awarded on the basis of bids," is instructive. *Id.* at 949.

Applying that explanation here, the agreement by the bidders to stop "bidding this up further and further," and instead to "form an LLC and stop the bidding process" had an anticompetitive purpose. Griffin proposed the LLC in the hope that competition between Seguin and Mayer would not continue; when Mayer agreed, she could not know that Griffin's authority was exhausted; and when Seguin agreed, he had no way of knowing that Mayer and Griffin were unable to outbid him.

Because the three bidders intended their agreement to eliminate further competition among them, we conclude that they engaged in bid rigging. Thus, we further conclude that when the three bidders ceased bidding and agreed to purchase the condominium unit together, they violated the Act's bid rigging provision. These conclusions require us to consider Amos's assertion that the remedy for bid rigging must be to void the foreclosure sale, which would afford her an opportunity to bid at a new sale.

### B. Voiding the Foreclosure Sale is Not the Only Remedy

Based on the undisputed testimony of Flaum and Mayer, which the trial court accepted, Amos suffered no economic injury from Seguin's conduct because the bidding could not have gone higher.[8] In civil antitrust cases, standing demands that the plaintiff show direct economic injury. *See Pomerantz v. Microsoft Corp.,* 50 P.3d 929, 932 (Colo.App.2002) (lack of standing under indirect purchaser rule precludes claim to void

---

7. In *Kearney v. Taylor,* 56 U.S. 494, 520, 15 How. 494, 14 L.Ed. 787 (1853), the Court explained that if "[t]he property at stake might be beyond the means of the individual, or might absorb more of them than he would desire to invest in the article, or be of a description that a mere capitalist, without practical men as associates, would not wish to encumber himself with," an agreement established joint bidding, rather than bid rigging. Joint bidding does "not ... prevent competition, but ... enable[s] ... the persons composing [the agreement] to participate in the biddings." *Id.* at 521. However, "shutting out competition, and depressing the sale, so as to obtain the property at a sacrifice" is bid rigging. *Id.*

8. Amos speculates that but for the three-party agreement, Mayer and Griffin might have pooled their resources to best Seguin's bid, thereby resulting in a higher price. However, Amos elicited no testimony from Mayer that she contemplated doing so or from Flaum that Griffin had contacted him to discuss this possibility. While we recognize some inherent uncertainty in determining what might have occurred absent bid rigging, the uncontroverted testimony of Mayer and Flaum supports the trial court's finding that "Seguin, Mayer and Flaum (via Griffin) were each unable to individually bid any higher than the [$]1.86 million winning bid."

licensing agreement under the Act). Hence, although not raised by the parties, we requested supplemental briefs addressing whether lack of standing defeats Amos's request for equitable relief voiding the foreclosure sale. *See, e.g., Winter Park Real Estate and Investments, Inc. v. Anderson,* 160 P.3d 399, 406 (Colo.App.2007) (standing is a threshold issue that may be addressed sua sponte).

■■■■ On the unusual circumstances presented here, we conclude that *Pomerantz* is distinguishable, and thus, lack of such injury to Amos from the bid rigging would not preclude the trial court from voiding the foreclosure sale, for three reasons. First, "traditional standing principles do not apply to defendants." *Mortgage Investments Corp. v. Battle Mountain Corp.,* 70 P.3d 1176, 1182 (Colo.2003). Here, the trial court considered bid rigging only as a defense to the quiet title claim. Second, while appellate courts may raise standing sua sponte, fairness requires consideration of whether the appellate court has "a complete and factually developed lower court record." *Moody v. People,* 159 P.3d 611, 615 (Colo.2007). We are unwilling to hold that Amos and the Estate lack standing, given the limitations resulting from the trial court's narrow approach to bid rigging. Third, to insure the integrity of public trustee foreclosures, which are statutory procedure, courts can void any foreclosure sale tainted by an "unconscionable condition." *Tekai Corp. v. Transamerica Title Ins. Co.,* 39 Colo.App. 528, 532, 571 P.2d 321, 324 (1977).

Generally, the Act contemplates money damages rather than equitable relief in private actions. *See* §§ 6–4–111, 6–4–114, 6–4–116, C.R.S.2009. It addresses such relief only prospectively for an ongoing violation, not as a remedy for a past violation. *See* § 6–4–113(1), C.R.S.2009 ("Any person injured ... may file an action to prevent or restrain any such violation."). Amos cites no case, nor have we found one, under the Act granting relief analogous to voiding a foreclosure. Yet, Amos argues that we must do so

under section 6–4–121, C.R.S.2009, which provides in relevant part:

> All contracts or agreements made by any person while a member of any combination, conspiracy, trust, or pool prohibited under this article which are founded upon, or are the result of, or grow out of, or are connected with any violation of this article, either directly or indirectly, shall be void, and no recovery thereon or benefit therefrom shall be had by or for any such person.

But the foreclosure process that resulted in a public trustee's deed to AA123 is not contractual. Rather than constituting a voluntary exchange, sections 38–38–102 to –105, C.R.S.2009, prescribe the public trustee's actions. *See Thomas v. Oken,* 699 P.2d 7, 9 (Colo.App.1984) ("Redemption rights are purely statutory...."); *Mortgage Finance, Inc. v. Podleski,* 742 P.2d 900, 903 (Colo. 1987) ("Parties to a contract voluntarily enter into a bargained-for agreement."). If the public trustee fails to perform those duties, the remedy is under the statute, not for breach of a contract.

Nevertheless, under section 6–4–121 none of the parties may benefit from such a tainted agreement. *Cf. R.P.T. of Aspen, Inc. v. Innovative Communications, Inc.,* 917 P.2d 340, 342 (Colo.App.1996) (if the parties' contract violates the Act, "the [c]ontract itself would be void and issues relating to it would be non-arbitrable"). Hence, we consider whether the foreclosure must be voided because the deed to AA123 was a benefit of the unlawful agreement.

But for that agreement, the public trustee would have issued the deed to Seguin, not to AA123. Thus, our bid rigging conclusion requires us further to conclude that the resulting benefit to AA123—the public trustee's deed—must be set aside.[9] As a consequence, the decree quieting title to the condominium unit in AA123 cannot stand. However, reversing the quiet title decree does not necessarily require voiding the foreclosure sale because Seguin's winning bid arose from competitive bidding before the unlawful agreement was made.

9. We need not address whether section 6–4–121 would also require that the agreement forming AA123 be voided because Amos did not request this relief below.

On the one hand, Amos did not attend the initial sale. We have affirmed the trial court's ruling rejecting her substantial compliance with redemption argument. Hence, setting aside the foreclosure sale would bestow a windfall on Amos by affording her a chance to bid at a new foreclosure sale. *See, e.g., Conoco, Inc. v. Tinklenberg,* 121 P.3d 893, 900 (Colo.App.2005) ("A windfall should be avoided if possible.").

On the other hand, Seguin's intent in accepting the proposal to stop competitive bidding and form AA123 was to protect himself from possible higher biding. Thus, an equitable decree directing the public trustee to issue a new deed to Seguin would benefit him while ignoring his role in the bid rigging. *Cf. Salzman v. Bachrach,* 996 P.2d 1263, 1269 (Colo.2000) ("[T]he clean hands maxim dictates that one who has engaged in improper conduct regarding the subject matter of the cause of action may, as a result, lose entitlement to an equitable remedy.").

In sum, both voiding the foreclosure sale and voiding the deed to AA123 but restoring the status quo by directing the public trustee to reissue the deed to Seguin would be an exercise of equitable discretion. *Handy v. Rogers,* 143 Colo. 1, 10–11, 351 P.2d 819, 824 (1960). Either remedy should be decided by the trial court, with appropriate findings. *Redd Iron, Inc. v. International Sales & Services Corp.,* 200 P.3d 1133, 1136 (Colo. App.2008). However, the present record includes no findings sufficient to balance the equities in favor of either voiding the sale or merely voiding the deed to AA123.

Accordingly, we reverse that portion of the judgment quieting title in favor of AA123. On remand, the trial court shall void the public trustee's deed to AA123. The trial court shall then exercise its equitable discretion, based on appropriate findings, to determine whether, after voiding the deed to AA123, the public trustee should be directed to accept Seguin's bid and issue the deed to him, or the foreclosure sale should be voided and the public trustee directed to conduct a new foreclosure sale, with attendant redemption rights to Amos and the Estate. In those proceedings, the court need not allow the parties to present additional evidence.

## V. Attorney Fees Awarded to AA123 Cannot Stand

Amos next contends the trial court erred in awarding attorney fees to AA123 because the notices of lis pendens that Amos filed were not spurious documents under C.R.C.P. 105.1 and section 38–35–204(2), C.R.S.2009 (spurious document statute); did not constitute slander of title; and did not violate section 38–35–109(3), C.R.S.2009. We agree.[10]

On May 11, 2007, Amos filed the complaint in this action and sought a temporary restraining order preventing the public trustee from issuing a deed to AA123, which was granted. In the complaint, Amos requested injunctive relief on the basis that she had exercised her right to redeem.

Amos also recorded a notice of lis pendens (first lis pendens) on May 11, 2007, which read:

> Notice is hereby given that an action has been filed affecting title to the real property described below. Plaintiff has brought an action to, among other things, compel Defendant to permit the redemption and prohibit the Defendant's issuance of a deed to the real property [situated] in Pitkin County, Colorado[.]

At the May 25 hearing to continue the temporary restraining order, Amos argued two alternative redemption theories: first, that she had complied with all the requirements because of the April 6 letter; and second, that regardless of the April 6 letter, she had substantially complied based on her attorney's letter and tender of the funds. Without making specific findings, the trial court continued the temporary restraining order until the preliminary injunction hearing.

10. Amos also contends the amount awarded—over $400,000—is "grossly excessive" and the trial court erred when it found AA123's attorney fees to be so inextricably intertwined that apportionment to removing the lis pendens was impossible. Because we conclude AA123 was not entitled to attorney fees, we need not reach this argument.

On July 26, 2007, nunc pro tunc to July 10, 2007, the trial court allowed Amos to amend her complaint to add the second principal claim at issue in this appeal: the Bank's failure to strictly comply with C.R.C.P. 120. According to the amended complaint, she sought an order "allowing the Estate to redeem" based on lack of notice to the Estate under C.R.C.P. 120(b). Such relief would be an exercise of the trial court's equitable powers. *Colorado Springs Board of Realtors, Inc. v. State,* 780 P.2d 494, 498–99 (Colo. 1989); *see also Z.J. Gifts D–2, L.L.C. v. City of Aurora,* 93 P.3d 633 (Colo.App.2004); *cf.* C.R.C.P. 65(f) ("If merely restraining the doing of an act ... will not effectuate the relief to which the moving party is entitled, an injunction may be made mandatory.").

On July 30, the trial court declined to convert the temporary restraining order into a preliminary injunction, finding that Amos had not shown a high likelihood of success on her redemption argument, and this temporary restraining order was allowed to expire on July 31. However, on July 30, the court also granted another temporary restraining order against issuance of the public trustee's deed based on the C.R.C.P. 120 claim. Although this order was dissolved by the court on August 8, by then Amos had filed a motion for preliminary injunction based on the C.R.C.P. 120 claim and the court had set a hearing date in October. However, the court never ruled on the motion.

AA123 sent letters on August 2 and 10 asking Amos to release the first lis pendens, which she did not do. On August 14, the public trustee issued the deed to AA123. Amos recorded a supplemental notice of lis pendens on August 27 (second lis pendens), which read:

> Notice is hereby given that an action has been filed affecting title to the real property described below. Plaintiff has brought an action to, among other things, render a public trustee foreclosure sale void for failure to comply with Colorado Rules of Civil Procedure 120; and for injunctive relief pursuant to Colorado Rule 65[.]

The C.R.C.P. 120 claim was decided against Amos on summary judgment in May 2008. The substantial compliance with re-demption procedures claim survived until the June 11, 2008, bench trial.

In awarding attorney fees, the trial court identified what it called the "linchpin"— Amos's April 6, 2007 letter to the public trustee—which the court had found to have been back dated. However, the court found the first lis pendens contained neither material misstatements nor had it been forged.

Instead, the court determined that the proper inquiry under the spurious document statute is whether the notice was "groundless or based on a false claim." The court concluded:

> because the April 6, 2007 letter was written "after the fact," the May 11 Notice [first lis pendens] was groundless and was based on a false claim, i.e., that Ms. Amos knew that she had not timely indicated her intent to redeem and prepared a false notice through the April 6, 2007 letter.

The court further concluded that the second lis pendens was spurious because it included the statement, "for injunctive relief." The court explained:

> At this point in the proceedings, the Court had entered its July 30, 2007 Order denying Plaintiffs Motion for preliminary injunction and made very specific findings that the April 6, 2007 letter was written after the redemption period and that there was no reasonable probability of success on the merits of her claim for injunctive relief. Despite this ruling, Plaintiffs proceeded to file their Supplemental Notice which was groundless.

The court went on to conclude that the two notices of lis pendens also met the requirements for slander of title. Specifically, the court explained that the falsity element was satisfied: "because the redemption claim was based on a groundless and false claim[,] ... the Notice is slanderous and contains a false claim." As to the second lis pendens, the court found that falsity was proven because of its finding "that the April 6, 2007 redemption letter was false and was never mailed," and Amos was not likely to succeed on injunctive relief.

Finally, the court held that both notices of lis pendens entitled AA123 to attorney fees

pursuant to section 38–35–109(3), because of its conclusion that the notices were groundless and because Amos refused to release them, despite AA123's requests.

■ "[W]e review de novo any statutory interpretation or legal conclusion that provides a basis for … a fee award." *US Fax Law Ctr., Inc. v. Henry Schein, Inc.*, 205 P.3d 512, 515 (Colo.App.2009).

### A. The Notices Were Not Spurious Documents under Section 38–35–204 and C.R.C.P. 105.1

Section 38–35–204 provides in relevant part:

(1) Any person whose real or personal property is affected by a recorded or filed lien or document that the person believes is a spurious lien or spurious document may petition the district court in the county or city and county in which the lien or document was recorded or filed or the federal district court in Colorado for an order to show cause why the lien or document should not be declared invalid. . . .

(2) If, following the hearing on the order to show cause, the court determines that the lien or document is a spurious lien or spurious document, the court shall make findings of fact and enter an order and decree declaring the spurious lien or spurious document and any related notice of lis pendens invalid, releasing the recorded or filed spurious lien or spurious document, and entering a monetary judgment in the amount of the petitioner's costs, including reasonable attorney fees, against any respondent and in favor of the petitioner.

C.R.C.P. 105.1 creates a procedure implementing the statute.

■ A notice of lis pendens can be a spurious document. *Pierce v. Francis*, 194 P.3d 505, 508 (Colo.App.2008). Section 38–35–201(3), C.R.S.2009, defines a spurious document as "any document that is forged or groundless, contains a material misstatement or false claim, or is otherwise patently invalid." A groundless document is one for which no rational argument based on the evidence or law can be advanced. *Platt v. Aspenwood*

*Condominium Ass'n*, 214 P.3d 1060, 1068 (Colo.App.2009).

Hence, focusing on whether the notices: (1) were forged or groundless; (2) contained a material misstatement or false claim; or (3) were otherwise patently invalid, we analyze each lis pendens separately as follows.

#### 1. The First Lis Pendens

■ We defer to the trial court's finding that the April 6, 2007, letter was back dated, which Amos does not challenge on appeal. *See Hall v. Frankel*, 190 P.3d 852, 858 (Colo. App.2008).

To meet the definition of a groundless document under the trial court's rationale, however, the substantial compliance claim described in the first lis pendens would have had to be based only on the back-dated letter. *Cf. Keenan ex rel. Hickman v. Gregg*, 192 P.3d 485, 489 (Colo.App.2008) (appeal found to be "meritorious, at least in part" warrants denial of attorney fees request for groundlessness under C.A.R. 38(d)). But Amos alternatively argued substantial compliance based on the May 8 notice sent by her attorney and timely tender of the necessary redemption amount.

Moreover, the trial court undercut its "groundless or based on a false claim" analysis when it said, in the same order, "The Court does not believe that Plaintiffs were acting in bad faith or that there was no merit to the claims being pursued." Therefore, the record does not show that the first lis pendens was groundless.

The first lis pendens identified the relief sought as "permit[ting] the redemption and prohibit[ing] … issuance of a deed." The trial court found:

None of these statements are material misstatements. They were true. . . . There was no evidence presented that the Notice was forged and no one contended at trial that the Notice was forged.

AA123 makes no separate argument that the first lis pendens was patently invalid, nor did the trial court make such a finding.

Accordingly, we conclude that the first lis pendens was not a spurious document.

### 2. The Second Lis Pendens

■ The trial court concluded that the second lis pendens was groundless because it stated that Amos was pursuing injunctive relief. When Amos filed the second lis pendens, the court had denied the preliminary injunction, which the court determined meant that no claim for injunctive relief was pending. However, denial of the preliminary injunction did not extinguish Amos's requests in the amended complaint for injunctive relief under the C.R.C.P. 120 or redemption theories.

Moreover, in ruling on the Bank's claim for attorney fees, the trial court found that "the [back-dated] letter had little, if anything, to do with the C.R.C.P. 120 claims which the bank had to defend." Hence, the letter also had little to do with the second lis pendens that references the C.R.C.P. 120 claim. Therefore, the trial court also erred in holding that the second lis pendens was a spurious document.

Accordingly, we conclude that the trial court erred in awarding attorney fees under the spurious document statute.

### 3. Amos Waived Appellate Attorney Fees Under Section 38–35–204(3)

■ For the first time in her reply brief, Amos requested attorney fees "on appeal," if she obtained reversal of the "erroneous conclusion that either [n]otice of lis pendens was groundless." Because C.A.R. 39.5 requires that appellate fee requests be made in principal briefs, we conclude that Amos waived her claim for appellate fees by raising this argument only in the reply brief.[11] *See Vanderbeek v. Vernon Corp.*, 25 P.3d 1242, 1248 (Colo.App.2000) (issues pertaining to an attorney fee award would not be addressed on appeal where they were raised for the first time in a reply brief); *Tuscany, LLC v. Western States Excavating Pipe & Boring, LLC*, 128 P.3d 274, 280 (Colo.App.2005) (same).

### B. The Notices Did Not Slander Title

■ Slander of title requires: (1) slanderous words; (2) falsity; (3) malice; and (4) special damages. *Fountain v. Mojo*, 687 P.2d 496, 500 (Colo.App.1984).

■ The trial court concluded that the two notices of lis pendens met the requirements for slander of title. The trial court cited no evidence or law to support its conclusion that the notices were false other than its previous conclusion that "the redemption claim was based on a groundless and false claim."

We have concluded that the claims underlying the notices of lis pendens were not groundless. Hence, we further conclude that the notices were not false and thus did not meet all of the requirements of slander of title. Therefore, attorney fees awarded as damages for slander of title cannot stand.[12]

### C. Section 38–35–109(3) Does Not Support an Attorney Fees Award

■ Section 38–35–109(3) provides in pertinent part:

> Any person who offers to have recorded or filed in the office of the county clerk and recorder any document purporting to convey, encumber, create a lien against ... real property, knowing or having a reason to know that such document is forged or groundless, contains a material misstatement or false claim, or is otherwise invalid, shall be liable to the owner of such real property for the sum of not less than one thousand dollars or for the actual damages caused thereby, whichever is greater, together with reasonable attorney fees.

Based on its finding both of the notices of lis pendens to have been groundless, the trial court further held that Amos had violated section 38–35–109(3) because she "willfully refused to release" the two notices when requested by AA123. But we have concluded that throughout the pendency of this suit, Amos maintained at least one claim that could affect the title to the condominium unit.

---

**11.** Because Amos did not request us to address her recovery of attorney fees incurred in the trial court, in the event of a reversal, we express no opinion whether she may do so on remand.

**12.** The trial court found that AA123 had no other damages on its slander of title claim.

Hence, we also reverse the trial court's finding that AA123 is entitled to its attorney fees and costs under this section.

### D. Bad Faith and Lack of Candor Exception Does Not Apply

On cross-appeal, AA123 argues an additional ground on which the attorney fees award should be upheld: the bad faith and lack of candor exception to the American Rule. *See, e.g., Jackson v. Moore,* 883 P.2d 622, 625 (Colo.App.1994). Attorney fees awards are reviewed for abuse of discretion. *See Dewey v. Hardy,* 917 P.2d 305, 310 (Colo. App.1995).

The trial court rejected this argument. As indicated, it found: "The Court does not believe that Plaintiffs were acting in bad faith or that there was no merit to the claims being pursued." For the same reasons that we have set aside the attorney fees awarded to AA123 under the spurious document statute and as damages for slander of title, we discern no abuse of discretion in this decision.

Accordingly, we reverse the attorney fees award in favor of AA123.

### VI. The Bank Was Entitled to Recover Attorney Fees

Finally, Amos contends the trial court erred in awarding the Bank $101,973.25 in attorney fees under loan documents executed among Amos, Righetti, two businesses, and the Bank.[13] We disagree.

On September 24, 2001, the Bank, Amos, and Righetti entered into several contracts pertaining to loans including:

- a Deed of Trust and Assignment of Rents [14] for the condominium;
- a Promissory Note in favor of the Bank for an $850,000 loan to Abkey No. 1, Ltd. and Amos;
- a Pledge and Security Agreement securing this note (the Pledge), under which the trial court awarded attorney fees, by Abkey No. 1, Ltd. and Amos in favor of the Bank;
- a Cross-Default and Cross-Collateralization Agreement (the Cross-Collateralization Agreement) "by and between" Abkey No. 1, Ltd.; Abkey No. 17, Inc.; Righetti; Amos; and the Bank.

The Cross-Collateralization Agreement, which identifies each of the above agreements in addition to other agreements among the Bank, Amos, Righetti, and the businesses, provides:

1. It is hereby declared and agreed that the No. 1 Pledge, the No. 17 Pledge and the Colorado mortgage [on the condominium] shall be deemed to have been executed and delivered by [Abkey No. 1] Ltd., [Abkey No. 17] Inc., and [Righetti and Amos] (as may be applicable), in favor of the [Bank], as collateral security for the timely and complete payment and performance of the obligations of [Abkey No. 1] Ltd., [Abkey No. 17] Inc., and [Righetti and Amos] evidenced by the No. 1 Note and evidenced by the No. 17 Note.... A default under the No. 1 Note ... and/or a default under the No. 1 Pledge ... and/or a default under the Colorado Mortgage shall, at the option of the [Bank], be deemed to constitute a default under the No. 1 Note ... and under the No. 1 Pledge ... and under the Colorado Mortgage, *thereby giving rise to all of the rights and remedies of the [Bank], in the event of such default, with respect to the ... No. 1 Pledge.*

2. [E]ach and every one of the terms, conditions, provisions, covenants and agreements contained within the ... No. 1 Pledge ... shall survive the execution of this Agreement, *are incorporated herein by reference* and shall remain in full force and effect.

(Emphasis added.)

Paragraph 12 of the Pledge provides:

The Pledgor shall be liable for all attorneys' fees and legal expenses incurred by the Secured Party in enforcing any of its rights and remedies hereunder. If, at any time, the Secured Party employ[s] counsel for advice with respect to any of the Col-

---

13. Amos does not separately contest the amount of fees awarded.

14. Although dated September 14, 2001, the Deed of Trust was signed on September 24, 2001.

lateral or files a complaint, petition to intervene, answer, motion, or other pleading in any suit or proceeding relating to any of the Collateral, or attempt[s] to collect on any of the Collateral from, or enforce any of the Collateral against, the Pledgor, all reasonable attorneys' fees and costs arising from such services shall be payable by the Pledgor to the Secured Party, on demand.

The Pledge states that Abkey No. 1 and Amos will be "collectively hereinafter referred to as the 'Pledgor'." The Bank and Amos were the only signatories to the Pledge, Amos signing both in her individual capacity and as president of Abkey No. 1's corporate general partner.

Under paragraph 1, "[t]he Pledgor hereby pledges ... [and] grants to Secured Party a first lien on, and a first perfected security interest in, the assets of the Pledgor described within Exhibit 'A' attached hereto, as collateral security."

Exhibit "A" provides:

All assets of the Pledgor including, but not limited to: (i) all equipment and machinery, furniture and fixtures now owned or hereafter acquired, together with all replacements thereof, all attachments, accessories, parts and tools belonging thereto or for use in connection therewith; (ii) all inventory, raw materials, work in process and supplies now owned or hereinafter acquired; (iii) all accounts receivable now outstanding or hereinafter arising; (iv) all contract rights, rights under lease agreements, rights under franchise agreements, chattel paper and general intangibles now in force or hereinafter acquired; and (v) all records and data relating to the assets of the Pledgor, whether in the form of a writing, photograph, microfilm, microfiche or electronic media, together with all of Pledgor's right, title and interest in and to all computer software required to utilize,

create, maintain and process any such records or data on electronic media.

Under paragraph 11, the Pledge "shall be governed by, and shall be construed and interpreted in accordance with the laws of the State of Florida."

We review the trial court's award of attorney fees to the Bank de novo because it involves interpretation of the Pledge. *Copper Mountain, Inc. v. Industrial Systems, Inc.*, 208 P.3d 692, 697–98 (Colo.2009).

Unambiguous contracts are enforced according to their plain language. *USI Properties East, Inc. v. Simpson*, 938 P.2d 168, 173 (Colo.1997). Where contract language is ambiguous, it should be interpreted under the law of the state whose law is agreed to in the contract. *Hansen v. GAB Business Services, Inc.*, 876 P.2d 112, 113 (Colo.App.1994). Although the trial court declined to apply Florida law, we do so as part of our de novo review based on the plain language of the Pledge.

Reading the attorney fees provision of paragraph 12 together with Exhibit A's definition of collateral as "all assets of the Pledgor," we conclude that the Bank's attorney fees and costs in this action are covered by the Pledge.[15] *Cf. Colo. Dep't of Revenue v. Woodmen of the World*, 919 P.2d 806, 814 (Colo.1996) (" '[A]ll' is an unambiguous term and means the whole of, the whole number or sum of, or every member or individual component of, and is synonymous with 'every' and 'each'."). We reject Amos's four contrary assertions as follows.

First, Amos argues that "Assets of the Pledgor" should be interpreted to include only those assets jointly owned by both Amos and Abkey No. 1, which had no interest in the condominium unit.[16] The term "Pledgor" appears throughout the agreement in the singular. However, because paragraph 14 provides that "the use of the singular herein shall be deemed to be or include the plural (and vice versa) whenever appropriate," in

15. Having affirmed the trial court's award of attorney fees on other grounds, we need not reach the Bank's alternative argument, which the trial court rejected, that it is entitled to attorney fees under the bad faith and lack of candor exception to the American Rule.

16. Because the point was not raised, we express no opinion whether Amos's signing the Pledge in her individual capacity could support awarding attorney fees against the Estate.

our view "Pledgor" can include either or both Amos and Abkey No. 1.

The phrase, "collectively hereinafter referred to as the 'Pledgor,'" does not required that all later references to "Pledgor" involve joint action, or as Amos specifically argues, joint ownership of collateral. For example, paragraph 8 identifies "Event[s] of Default," including:

- an untrue "statement of a material fact" by Pledgor;
- a written admission of "Pledgor's inability to pay Pledgor's debts";
- "a petition for an arrangement of Pledgor's debts";
- "an assignment for the benefit of Pledgor's creditors";
- "if a receiver shall be appointed for Pledgor's property";
- "if Pledgor shall be adjudged bankrupt or insolvent."

Under Amos's interpretation, any such act would constitute a default only if it involved *both* Amos and Abkey No. 1. But the Bank would have reason to be concerned about collectibility of the debt if *either* Amos or Abkey No. 1 committed any of these acts. *Cf. In re Loral Space and Communications, Ltd.*, 412 B.R. 64, 68 (S.D.N.Y.2009) (although agreement defines "'Loral' to refer collectively to all of the Debtors," in other provisions "it is apparent that the parties intended the term 'Loral' to refer to specific Loral entities").

Second, Amos argues that "collateral" is limited to the examples listed in Exhibit A, all of which are types of personal property. We decline to treat "including, but not limited to" as restrictive. *Cf. Childers v. State*, 936 So.2d 585, 597 (Fla.Dist.Ct.App.2006); *see also A Dictionary of Modern Legal Usage* 432 (B. Garner ed., 2d ed. 1995) ("Including but not limited to" is "essential to defeat three canons of construction [including]: includio unius est exclusio alteris ('To express one thing is to exclude the other').").

Third, Amos argues that if the Pledge and the Deed of Trust are construed together, they conflict. The Pledge grants a first security interest in the collateral to the Bank. Likewise, the Deed of Trust grants a first

security interest in the property to the Bank. We perceive no conflict between two contracts giving the same creditor a first lien position in the same property.

Fourth, Amos cites language in one Florida case limiting collateral to "a pledge of incorporeal property." *Travers v. Stevens*, 108 Fla. 11, 145 So. 851, 854 (1933). *Travers* has never been cited for this proposition, which was not essential to its holding. Absent stronger or more recent support for this proposition, we decline to adopt such a restrictive definition. *See generally A Dictionary of Modern Legal Usage* at 169 ("Collateral" is "security for a loan").

■■■■■ Moreover, even under Amos's narrow interpretation of "Pledgor," the condominium's status as collateral under the Cross-Collateralization Agreement affords the Bank additional remedies, including the attorney fees provision of the Pledge, as to fees incurred concerning the condominium. "Florida law is well-settled that where two or more documents are executed by the same parties at or near the same time, in the course of the same transaction, and concern the same subject matter, they will be read and construed together." *Hopfenspirger v. West*, 949 So.2d 1050, 1053 (Fla. Dist. Ct. App. 2006). "Furthermore ... where a writing expressly refers to and sufficiently describes another document, the other document is to be interpreted as part of the writing." *Id.* "The court should reach a contract interpretation consistent with reason, probability, and the practical aspect of the transaction between the parties." *Whitley v. Royal Trails Property Owners' Ass'n*, 910 So.2d 381, 383 (Fla. Dist. Ct. App. 2005). Florida requires attorney fee agreements to "be clear and specific." *Village 45 Partners, LLC v. Racetrac Petroleum Inc.*, 831 So.2d 758, 760 (Fla. Dist. Ct. App. 2002).

Paragraph 2 of the Cross-Collateralization Agreement incorporates the attorney fee provision from the Pledge, which "remain[s] in full force and effect." According to paragraph 1 of the Cross-Collateralization Agreement, Amos's admitted default "giv[es] rise to all of the ... remedies of the [Bank] ... with respect to the ... No. 1 Pledge." And

the Cross-Collateralization Agreement expressly made the condominium security for the same loan described tin the Pledge. Hence, we perceive no reason why the remedies in the Pledge would not apply to the condominium.

Accordingly, we affirm the award of attorney fees to the Bank. Additionally, the Bank is entitled to reasonable attorney fees on appeal, in an amount to be determined by the trial court on remand. C.A.R. 39.5.

The decree quieting title in AA123 is reversed and the case is remanded with instructions to determine an equitable remedy and to award reasonable attorney fees to the Bank for the appeal under C.A.R. 39.5. The award of attorney fees to AA123 is reversed. In all other respects, the judgment stands affirmed.

ROMán and BERNARD, JJ., concur.